STATE OF NORTH CAROLINA v. TOMMY NOELL

No. 10

(Filed 25 February 1974)

**1. Jury §§ 5, 7— jurors acquainted with defendant — challenge for cause — excusal proper**

The trial court did not err in excusing for cause three prospective jurors who stated unequivocally that because of their acquaintance and friendship with defendant and his family they could not find defendant guilty even though the State had convinced them beyond a reasonable doubt of his guilt.

2. **Constitutional Law § 29; Jury § 7— challenge of Negroes on petit jury — no systematic exclusion**

Where defendant showed that the solicitor challenged for cause all prospective Negro jurors who indicated some bias toward defendant because of their acquaintance with him or because of their feelings against the death penalty and the solicitor peremptorily challenged ·the last remaining Negro on the petit jury but the record was silent about any prior instances in which the solicitor challenged Negroes from the jury, defendant failed to establish a *prima facie* case of arbitrary and systematic exclusion of Negroes from the jury. Art. I, § 26, Constitution of North Carolina; Amendments VI and XIV to the Constitution of the United States.

3. **Jury § 7— challenge of juror for cause — denial — subsequent peremptory challenge**

Defendant was not prejudiced by the trial court's refusal to excuse a juror for cause where defendant questioned the juror with respect to any prejudice she might have because defendant, a Negro, had married a white woman, the trial court overruled defendant's motion to excuse her for cause and instructed defense counsel that he could examine the juror further if he wanted to, counsel chose not to do so but excused her peremptorily, and defendant made no request for additional peremptory challenges.

4. **Constitutional Law § 29; Criminal Law § 135; Jury § 7— jurors opposed to death penalty — excusal for cause**

Where it was clear from three prospective jurors' answers in the record upon *voir dire* examination that each of them, before hearing any of the evidence, had already made up his mind that he would not return a verdict in this rape case pursuant to which the defendant might lawfully be executed, whatever the evidence might be, the trial court properly permitted the jurors to be excused for cause.

5. **Jury §§ 5, 7— examination of juror as to reasonable doubt — challenge for cause denied**

Trial court did not err in refusing to excuse a juror for cause where the juror indicated that if he had a reasonable doubt, he would not find defendant guilty, if the doubt was strong enough, and the juror thereafter told the court he would not hesitate to return a verdict of not guilty if he had a reasonable doubt as to defendant's guilt.

6. **Criminal Law §§ 96, 119; Rape § 4— hearsay evidence — immediate withdrawal and instruction by court — failure to request further instruction**

Where the victim in a rape case testified that a surgical nurse who helped examine her after the assault told her that she had sub-cutaneous hemorrhages about her eyes, the court's prompt action in sustaining defendant's objection, allowing his motion to strike, and instructing the jury not to consider what the surgical nurse told the witness and to dismiss that from their minds was sufficient to eliminate any possible prejudice to defendant, particularly since the matter objected to had already been established in evidence and

since defendant's counsel did not request any more specific instruction to the jury.

7. **Criminal Law § 96; Rape § 4— incompetent evidence immediately withdrawn — no prejudice to defendant**

Testimony by the examining nurse in a rape case that tests given the victim were "normal procedure in any normal rape case" and testimony that she did not know the whereabouts of the doctor who performed the tests did not prejudice defendant since the court in both instances instructed the jurors not to consider the answers by the witness.

8. **Criminal Law § 87— leading question properly allowed**

The trial court in a rape case did not abuse its discretion in allowing the solicitor to ask the investigating officer a leading question.

9. **Constitutional Law § 31— right of defendant to have crime investigated**

Defendant's right to obtain and preserve evidence and his right to a fair trial were not violated when the police failed to take immediate action following his arrest for rape to interview his alibi witness, to place a watch found in the victim's apartment on defendant's wrist to see if it matched the impression that the investigating officer stated he observed on defendant's wrist, to check defendant's outer garments, underwear, fingernails and other body parts, to seize the shirt that officers testified they saw hanging on a clothesline at defendant's home, to search the vehicle allegedly driven by the attacker, and to obtain a search warrant to search the premises occupied or used by defendant, since there was no showing that the investigation wanted by defendant would have produced evidence that had any bearing on the outcome of the case.

10. **Criminal Law § 88— cross-examination of defendant**

The trial court did not err in allowing the defendant to be cross-examined with respect to his whereabouts one year prior to the date of the crime charged since a defendant who voluntarily testifies becomes subject to cross-examination and may be required to answer questions designed to impeach or discredit him and since this particular question, even if irrelevant, did not mislead the jury or prejudice defendant.

11. **Criminal Law § 102— jury argument of solicitor — matter outside record argued — no prejudice**

That portion of the solicitor's argument which went outside the record in responding to defendant's contention that the police had failed to do all that they could to preserve the evidence concerning the crime and suggested that the police could not abandon investigation of all other violations to concentrate their efforts on this particular crime did not constitute an impropriety so sufficiently grave as to be prejudicial to defendant.

12. **Criminal Law § 102— solicitor's jury argument — reference to veracity of witnesses**

Where the testimony of defendant, his wife, and his witnesses all conflicted with respect to defendant's whereabouts on the day before

State v. Noell

the crime was allegedly committed, the solicitor's statement to the jury, "I submit to you, that they [defendant's witnesses] have lied to you" represented a reasonable comment on the evidence.

**13. Criminal Law § 102— solicitor's jury argument — defendant's objection sustained — no prejudice**

Defendant was not prejudiced by the solicitor's jury argument that defense counsel had "done a fine job in defending his client. When you don't have a defense, you do the best you can," nor was defendant prejudiced when the solicitor in his argument stated, "You know when your defense is mighty weak, it is common to employ . . . " , defendant objected before the statement was completed, and the court sustained the objection.

**14. Criminal Law §§ 102, 165— solicitor's jury argument — failure of defendant to object**

Defendant was not prejudiced where the solicitor in his jury argument called attention to defendant's previous criminal convictions, but defendant made no objection to the argument at the time and made no request for an instruction to the jury about the significance of character evidence.

**15. Criminal Law § 111— sufficiency of jury instructions**

Trial court's instruction which applied the law to the evidence and gave the positions taken by the parties as to the essential features of the case complied with the requirements of G.S. 1-180, though the court failed to refer specifically to certain portions of defendant's testimony.

**16. Rape § 6— failure to submit assault with intent to commit rape — no error**

Where defendant's defense to the charge of rape was that of an alibi and the prosecutrix testified positively that after defendant had choked her and threatened to kill her, he forcibly and against her will had sexual intercourse with her and that he did in fact penetrate her, there was no evidence of an assault with intent to commit rape, and the trial court was not required to charge on the lesser included offense.

**17. Criminal Law § 162— failure to object to incompetent evidence — no prejudice**

Testimony indicating that the baby of defendant and his wife was conceived out of wedlock, though incompetent, was not ground for a new trial where defendant did not object to the testimony or move to strike.

**18. Constitutional Law § 36; Criminal Law § 135; Rape § 7— death penalty proper in rape case**

The death penalty was the sole and exclusive punishment for rape committed by defendant subsequent to 18 January 1973, the date of *State v. Waddell*, 282 N.C. 431.

Chief Justice BOBBITT and Justices HIGGINS and SHARP dissenting as to death sentence.

State v. Noell

APPEAL by defendant from *Hall, J.,* at the 30 July 1973 Session of ORANGE Superior Court.

On an indictment proper in form, defendant was tried and convicted of raping Linda DiCenzo. Defendant appeals from a judgment imposing a sentence of death.

The State's evidence tends to show that on 23 May 1973 Linda DiCenzo was employed as a nurse's aide at the North Carolina Memorial Hospital in Chapel Hill. Miss DiCenzo left the hospital at approximately 8:55 a.m. on that date and drove to her apartment on Highway 54 Bypass in Carrboro, North Carolina. She arrived at her apartment at approximately 9:05 a.m. On the way to her apartment she had seen defendant in a car in front of her. Defendant had turned off Highway 54 Bypass into the apartment complex in front of Miss DiCenzo and then pulled over to the curb, allowing her to pass him. When she got to her apartment she again noticed defendant drive by.

Miss DiCenzo went in her apartment, closed the door, and proceeded toward the bedroom. She then heard a knock at the door, and since she was expecting a friend to come by to go shopping, she said "come in." Defendant walked in and said he was selling vacuum cleaners. She replied that she did not want a vacuum cleaner, but that he could come back that evening and talk to her roommate about getting one. Defendant turned around and went toward the door as though he was leaving, but rather than leaving, he locked the door. He then turned to Miss DiCenzo and informed her in obscene language that he intended to have sexual intercourse with her then or else he would kill her. She screamed and defendant put his hand over her mouth and started strangling her. After she unsuccessfully tried to persuade defendant to leave, he "pulled" her from the living room into the bedroom and proceeded to rape her. During the course of this experience, Miss DiCenzo lost consciousness several times. Once upon regaining consciousness, she discovered that defendant had left and she then called the Carrboro Police Department.

Miss DiCenzo's testimony also revealed the following: The rape transpired during the day, she saw defendant's face, and she had no doubts whatsoever that defendant was her attacker; defendant was wearing light green slacks and a burgundy or maroon pull-over knit shirt with stripes; defendant was driving

State v. Noell

a small compact car that was light green with a stripe down the side, and the car had a vinyl top that was a darker green in color than the body, maybe even being black; and although she never saw a watch on defendant's wrist, when defendant left she found a watch with a broken band on the floor in the walking area between the living room and the bedroom where defendant had been.

Patrolman Kenneth Horne of the Carrboro Police Department testified that he received a call from Miss DiCenzo on 23 May 1973 and that he arrived at her apartment at 9:42 a.m. He noted that when he arrived Miss DiCenzo's hair was messed up, her throat and arms were scratched, and there was blood in her eyes. Another witness for the State, Mrs. Mary Ford, who helped examine Miss DiCenzo at the North Carolina Memorial Hospital emergency room, also testified about Miss DiCenzo's physical appearance following the alleged incident, and her testimony corroborated that of Patrolman Horne.

Captain John Blackwood of the Carrboro Police Department conducted the investigation involving Miss DiCenzo's alleged rape. He had first taken Miss DiCenzo to the hospital. At approximately 2:30 p.m. he took her from the hospital to the Carrboro Police Department. His conversations with her there led to the subsequent arrest of defendant.

Originally the officers went to defendant's home at Greenway Trailer Park in Chatham County. There on defendant's clothesline Captain Blackwood saw a dark red pull-over shirt with blue stripes. The shirt was wet and appeared to have just been washed. Defendant's wife came to the door and informed the officers that defendant was at his brother's trailer. The police went there and arrested him.

At the police department defendant informed Captain Blackwood that he knew nothing about the alleged raping. He said that at approximately 9 a.m. that day he had been in Durham at Bronson's Tire Company applying for a job. He had a 9 a.m. appointment for this job interview. Defendant also informed the police that although he owned a car, it was broken down and that he had been driving his mother's car that day. This car was a 1971 Maverick. It was green with a brownish vinyl roof, and also had a stripe across the trunk.

Defendant was also asked if he had a watch. He replied that he owned a watch but that he had lost it a couple of weeks before. Captain Blackwood testified that he observed an impression on defendant's left wrist that appeared to be the impression of a wrist watch, and that there was no such impression on defendant's right wrist. During cross-examination by defense counsel it was revealed, however, that defendant had been handcuffed on the way to the police station. Captain Blackwood did not place the wrist watch found at Miss Di-Cenzo's apartment on defendant's arm to see if it matched the impression.

Captain Blackwood also testified that he went to Bronson's Tire Company to check out defendant's alibi.

Defendant testified in his own behalf. He denied having raped Linda DiCenzo or ever having seen her before the trial. He stated that he woke up around 7:30 a.m. on 23 May 1973, took his mother to work, and then picked up two children and took them to a day-care center. On the day before, 22 May, about 3 p.m. defendant had gone to see Ray Locke at the Snelling & Snelling employment service in Chapel Hill. Locke had told him to take an appointment card to Bronson's Tire Company in Durham and to be neatly dressed. Defendant testified that he did not take the appointment card out of the envelope until he got to Durham the following morning.

After leaving the children at the day-care center on the morning of 23 May, it was a little after 8 a.m. Defendant then proceeded to Bronson's Tire Company in Durham. He testified that on the way over he had a flat tire and that he finished changing the tire about 8:20. When he arrived at Bronson's Tire Company it was past 9 a.m., but the place was not yet open. While he waited for it to open, he attempted to fix a broken door on his mother's car. Defendant's description of the car was as follows: It was a light green Maverick with a brown vinyl top. He specifically noted that it did not have a stripe down the side.

Defendant testified that at 9:10 or 9:15 a.m. he talked with Bill Austin about the job and filled out an application. He left Bronson's Tire Company around 9:25 a.m. and drove home, the trip being 17 or 18 miles and taking about 25 minutes. When he arrived at his trailer, he helped his wife re-arrange some

State v. Noell

furniture. They had been in the process of moving into their trailer from another trailer since the previous Monday, 21 May.

Around 9:50 a.m. defendant decided to go over to his mother's and work on his car. Therefore, he changed into some work clothes; before changing clothes he was wearing a pair of maroon pants and a flower design shirt that buttoned. He also testified that the shirt was not a knit shirt, and that he had had these clothes on all day. Furthermore, he stated that he did not take any clothes with him to Bronson's Tire Company besides the clothes he was wearing.

During its cross-examination of defendant, the State introduced an appointment card from Snelling and Snelling employment service that defendant identified as being the one Ray Locke had given him. The card reads as follows: "Mr. Bill Austin, Service Manager, Bronson's Tire Company, 1014 North Main Street, Durham, 5-22-73; time 9:00 a.m." Defendant acknowledged that the date "5-22-73" would indicate that the appointment was for "the day before May 23." He also admitted on cross-examination: His mother's car has a double stripe down the hood and a double stripe down the trunk of the car; he had worked as a vacuum cleaner salesman until the Thursday before the date of the alleged raping; he was convicted on 9 May 1972 of an assault, and that he had previously been convicted of a conspiracy. He denied that he forced a lady named Leslie Morecock to have intercourse with him on 6 January 1973.

Defendant's next witness was his mother, Mrs. Loulabelle Noell. She corroborated defendant's testimony about his picking her up on the morning of 23 May; about her loaning him her car to go for the job interview on that day; about the clothing he was wearing that day; about his having had a flat in that she later discovered a flat tire in the trunk of her car; and about the door to her car having been broken. On cross-examination she testified that she last saw defendant on the morning of 23 May at 7:50 a.m. when he dropped her off at her work. She also testified that he used her car on the afternoon of 22 May, but not during the morning of 22 May. She stated that his car was "in the process of going bad, and it was hard to start, but he could use it" on 22 May.

Defendant next offered Sadie Horton Edwards as a witness. She testified that she was working at the Chapel Hill

State v. Noell

Cooperative Child Care Center on 23 May 1973 and that she had seen defendant bringing some children to the Center "early" that morning.

Defendant's next witness was Bill Austin. He testified that he was the manager of Bronson's Tire Company in Durham, and that he had seen defendant between 9 and 10 a.m. on either 22 May or 23 May; he could not remember which although he was positive he had seen him on one of the two days. Austin was "not positive" about what defendant had been wearing when he saw him, but he did testify that he remembered "it was a shade of blue, or something of that nature, it was not a solid color. As best I can remember he was wearing a button-down shirt. I do not recall the color of his trousers. I did not notice any unusual marks or abrasions on his face." Austin also testified that someone from Snelling and Snelling had called him on what he believed was 21 May and told him that defendant would be coming over.

Defendant also called his wife, Barbara Noell, as a witness. She testified that she and defendant were married on 17 March 1973. She stated that she and defendant spent 21 May and 22 May moving into a different trailer, and that she was with him during all the morning on 22 May except for a brief time prior to 7:50 a.m. when he had taken his mother to work. Therefore she said defendant could not have gone to Durham on the morning of 22 May. She testified that on the morning of 21 May he called Snelling and Snelling and he was then informed about the job opening in Durham at Bronson's Tire Company. She stated that on the evening of 22 May she and defendant went to his mother's house to arrange for him to borrow his mother's car to go to Durham on 23 May. She corroborated his testimony about what he wore on 23 May; that is, burgundy slacks and a flower design shirt that buttoned. She estimated that he returned from Durham sometime around 9:30 a.m. on 23 May.

Mrs. Noell partially corroborated Captain Blackwood's testimony about a shirt being on the clothesline at defendant's home. She testified that the shirt was a "gray knit pull-over shirt with two burgundy, wine stripes across the chest, with baby blue stripes above and below the burgundy stripes. The shirt was gray." She stated that she had hung the shirt up to dry on the night of 22 May. She further testified that defendant

State v. Noell

did not own any light green pants, but that he did have a red shirt with blue stripes; however, this shirt was packed on 22 and 23 May because of the move. Additionally, she noted that defendant had worn the same clothes on both 22 and 23 May because everything else was packed for their move. On cross-examination she stated that defendant did not tell her on 22 May that he had been to Snelling and Snelling.

At the completion of his wife's testimony, defendant again took the stand. He noted that he had been nervous when he had earlier testified about having gone by Snelling and Snelling on 22 May at 3 p.m. He testified that he had his mother's car on 22 May and that he had taken her to work that morning and some children to the day-care center, and that then he believed he had gone by Snelling and Snelling. It was on this occasion, he testified, that Mr. Locke gave him the appointment card for Bronson's Tire Company. After leaving Snelling and Snelling, defendant returned home. On cross-examination defendant testified that he had decided to change his testimony because while his wife was testifying he had remembered that his trip to Snelling and Snelling was on the morning of 22 May.

Defendant then rested, and the State called Roy Locke, an employment counselor with Snelling and Snelling, as a rebuttal witness. Locke testified that he knew defendant by sight and that defendant was in his office in Chapel Hill at 8 a.m. on 22 May. According to Locke, the interview with Bronson's Tire Company had been set up on the previous day, 21 May, and was for 22 May at 9 a.m. in Durham. Locke said that he did not know what day defendant had actually gone for the interview, but that he had made no change in the interview time. Locke also testified that on the morning defendant came by— 22 May—he was wearing a "red tank shirt." Locke asked him if he planned to change his shirt, and he replied that he did.

Following Locke's testimony, the State rested.

*Attorney General Robert Morgan and Assistant Attorney General John R. B. Matthis for the State.*

*Robert Epting for defendant appellant.*

*David E. Kendall for the NAACP Legal Defense Fund.*

MOORE, Justice.

Defendant first assigns as error the action of the trial court in excusing for cause three prospective jurors: Mr. Alston, Dorothy Stone, and Katherine Alston.

[1]  During the selection of the jury, several veniremen stated that they knew defendant and his family. The solicitor asked one of them, Mr. Alston, about the extent of his acquaintance with defendant. Mr. Alston replied, "Acquainted with the whole family." The solicitor then asked, "Well, let me ask you this, sir. As a result of your acquaintance with the family, would it be impossible for you to bring in a verdict of guilty against the defendant?" To which Mr. Alston replied, "I would think so." In reply to the solicitor's next question if he would find defendant guilty if the State satisfied him beyond a reasonable doubt of his guilt, Mr. Alston replied, "Very well acquainted with the family." The judge then stated, "That is not the point he's making. If the State satisfied you beyond a reasonable doubt, would you be able to find him guilty?" Mr. Alston replied, "With the connection of the family, no sir." The judge then excused him for cause.

Venireman Dorothy Stone stated that she knew defendant, had worked with him in the city schools, was well acquainted with his mother, and was a good friend of the family. In reply to the solicitor's question, "Would the fact that you're acquainted with and a friend of the family of Mr. Noell make it impossible for you to bring in a verdict of guilty, even if the State satisfied you of his guilt, beyond a reasonable doubt?" She replied, "It would." The judge then excused her for cause.

Venireman Katherine Alston stated that she knew defendant and his family and considered them good friends. In answer to the solicitor's question, "If the State satisfied you of Tommy Noell's guilt beyond a reasonable doubt, would it be impossible for you to bring in a verdict of guilty?" She replied, "Yes, it would." The judge then excused her for cause.

G.S. 9-14 provides "[T]hat the presiding judge shall decide all questions as to the competency of jurors." Decisions as to a juror's competency to serve rests in the trial judge's sound discretion. *State v. Harris*, 283 N.C. 46, 194 S.E. 2d 796 (1973); *State v. Johnson*, 280 N.C. 281, 185 S.E. 2d 698 (1972). The trial judge's rulings on such questions are not

State v. Noell

subject to review on appeal unless accompanied by some imputed error of law. *State v. Harris, supra; State v. Watson,* 281 N.C. 221, 188 S.E. 2d 289 (1972). "The ruling in respect of the impartiality of [a juror] presents no reviewable question of law." *State v. DeGraffenreid,* 224 N.C. 517, 31 S.E. 2d 523 (1944). See also *State v. Spencer,* 239 N.C. 604, 80 S.E. 2d 670 (1954).

In *State v. Spence,* 274 N.C. 536, 539, 164 S.E. 2d 593, 595 (1968), Justice Higgins stated:

"According to the Federal Court decisions 'the function of challenge is not only to eliminate extremes of partiality on both sides but to assure the parties that the jury before whom they try the case will decide on the basis of the evidence placed before them and not otherwise.' The purpose of challenge should be to guarantee 'not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the State the scales are to be evenly held.' *Swain v. Alabama,* 380 U.S. 202; *Tuberville v. United States,* 303 F. 2d 411 (cert. den. 370 U. S. 946); *Logan v. United States,* 144 U.S. 263; *Hayes v. Missouri,* 120 U.S. 68."

The three prospective jurors in question stated unequivocally that they could not find defendant guilty even though the State had convinced them beyond a reasonable doubt of his guilt. Thus, they were not impartial jurors and were properly excused for cause.

[2] In his next assignment of error defendant notes that the trial judge allowed the solicitor's challenges for cause of all the prospective Negro jurors who indicated some bias toward defendant because of their acquaintance with him or because of their feelings against the death penalty. Then defendant notes that the solicitor asked the last Negro venireman how long he had known defendant, to which the venireman replied either four or five years. The solicitor peremptorily challenged this venireman. Defendant complains that the trial judge's permitting the elimination of the last remaining Negro from the petit jury by a peremptory challenge after all the other Negroes had been excused for cause violated defendant's rights under the Sixth and Fourteenth Amendments to the United States Constitution and under Article I, section 26, of the North Carolina Constitution.

"In all capital cases the State may challenge peremptorily *without cause* nine jurors for each defendant and no more." G.S. 9-21(b). (Emphasis added.) Peremptory challenges are challenges that may be made according to the judgment of the party entitled thereto without being required to assign a reason therefor, and the reason for challenging a juror peremptorily cannot be inquired into. *State v. Allred,* 275 N.C. 554, 169 S.E. 2d 833 (1969). A defendant has no right to be tried by a jury containing members of his own race or even to have a representative of his own race to serve on the jury. Defendant does have the right to be tried by a jury from which members of his own race have not been systematically and arbitrarily excluded. The burden is upon the defendant, however, to establish racial discrimination in the composition of the jury. *State v. Cornell,* 281 N.C. 20, 187 S.E. 2d 768 (1972).

In *Swain v. Alabama,* 380 U.S. 202, 222, 13 L.Ed. 2d 759, 773, 85 S.Ct. 824, 837 (1965), the United States Supreme Court in discussing this question stated:

"In the light of the purpose of the peremptory system . . . we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it.

\*　　\*　　\*

" . . . There is no allegation or explanation, and hence no opportunity for the State to rebut, as to when, why and under what circumstances in cases previous to this one the prosecutor used his strikes to remove Negroes. In short, petitioner has not laid the proper predicate for attacking the peremptory strikes as they were used in this case. Petitioner has the burden of proof and he has failed to carry it."

Defendant's mere showing that all Negroes in this case were challenged by the solicitor is not sufficient to establish a *prima facie* case of an arbitrary and systematic exclusion of Negroes. The record is silent about any prior instances in which the solicitor challenged Negroes from the jury. The defendant has the burden of proof of showing such arbitrary and systematic exclusion, and he has failed to carry that burden. This assignment is without merit.

[3] Defendant next assigns as error the refusal of the trial court to grant defendant's motion to excuse for cause a juror who expressed the view that defendant's interracial marriage would adversely affect her deliberations in the cause. The record pertaining to this juror shows the following occurred:

"MR. EPTING [counsel for defendant]: Now, Mrs. Carver, would you let the fact that this man is from an interracial marriage affect your consideration of the testimony in this case?

JUROR CARVER: No.

MR. EPTING: Do you have any personal feelings about interracial marriages?

JUROR CARVER: Not especially.

MR. EPTING: Well, I take it from your answer that you mean that they are not especially strong feelings?

JUROR CARVER: Yes, sir.

MR. EPTING: Do you have any feelings for or against interracial marriages, or are you telling me that your feelings are neutral?

JUROR CARVER: Mine would be against.

MR. EPTING: Do you feel that your feelings against interracial marriage could affect your consideration of the testimony in this case?

JUROR CARVER: It probably could.

MR. EPTING: Your Honor, I would ask that Mrs. Carver be excused.

COURT: The challenge for cause is overruled. You may examine her further, if you would like to."

State v. Noell

Defendant cites Aldridge v. United States, 283 U.S. 308, 75 L.Ed. 1054, 51 S.Ct. 470 (1931), in support of his contention that the court should have excused Mrs. Carver for cause. In that case the United States Supreme Court held that the refusal of a lower court to accede to a request that jurors be interrogated about racial prejudice was reversible error in a trial where a Negro was charged with killing a white man. This holding was reaffirmed in Ham v. South Carolina, 409 U.S. 524, 35 L.Ed. 2d 46, 93 S.Ct. 848 (1973). In the present case, however, defendant was allowed to question Mrs. Carver about any prejudice she might have because defendant, a Negro, had married a white woman, and, after overruling defendant's motion to excuse her for cause, the trial court again told defendant's counsel, "You may examine her further, if you would like to." Counsel chose not to do so and excused her peremptorily. Under these circumstances, neither Aldridge nor Ham applies.

The question of a juror's competency rests in the sound discretion of the trial judge and his ruling is not subject to review on appeal unless accompanied by some imputed error of law. State v. Harris, supra; State v. Watson, supra. No such error appears in connection with the challenge to the prospective juror Mrs. Carver, and no request for additional peremptory challenges was made by defendant as was done in State v. Allred, supra. Hence, this assignment is overruled.

[4] Defendant next asserts that "the trial court erred in permitting the State to excuse for cause several jurors who expressed death penalty reservations in form other than as required by the principles of Witherspoon v. Illinois, 391 U.S. 510 [20 L.Ed. 2d 776, 88 S.Ct. 1770] (1968)."

In Witherspoon the United States Supreme Court held that the sentence of death may not be carried out if the jury that imposed it was chosen by excluding veniremen for cause simply because they had general objections to the death penalty or expressed conscientious or religious scruples against infliction of the death penalty. But in footnote 21 of that opinion it is stated:

"We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made

unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt."

Since *Witherspoon* this Court has held that if a prospective juror states that under no circumstances could he vote for a verdict that would result in the imposition of the death penalty no matter how aggravated the case and regardless of the evidence shown, the trial court can properly dismiss the juror upon a challenge for cause. *State v. Anderson,* 281 N.C. 261, 188 S.E. 2d 336 (1972) ; *State v. Watson,* 281 N.C. 221, 188 S.E. 2d 289 (1972) ; *State v. Cook,* 280 N.C. 642, 187 S.E. 2d 104 (1972) ; *State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572 (1971) ; *State v. Dickens,* 278 N.C. 537, 180 S.E. 2d 844 (1971) ; *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969).

The three jurors to which this assignment pertains were Rogers, Dennis, and Beaver. The record as to Rogers reads:

"MR. PIERCE [the solicitor] : And Mrs. Rogers, let me ask you the same question, that I have been asking. Would it be impossible for you to bring in a verdict requiring the imposition of the death penalty, under any circumstances, no matter—even though the State proved to you the defendant's guilt beyond a reasonable doubt?

JUROR ROGERS: I do not believe in capital punishment.

MR. PIERCE: Let me ask you this question, again, with your answer in mind, please. Would it be impossible to bring in a verdict that required the imposition of the death penalty, no matter what the State showed you, by way of the evidence?

JUROR ROGERS: I think so."

As to Dennis the following transpired:

"MR. PIERCE: Mr. Dennis and Mr. Snipes, let me go ahead and get to this question. Let me ask you, would either one of you find it impossible, under any circumstances, to bring in a verdict which resulted in the imposi-

State v. Noell

tion of the death penalty, even though the State satisfied you beyond a reasonable doubt of the defendant's guilt, from the evidence in this case?

[Mr. Snipes' answers omitted.]

JUROR DENNIS: I really don't know.

MR. PIERCE: Let me put the question to you the same way, would it be impossible, under any circumstances, even though the State had satisfied you beyond a reasonable doubt, from the evidence in the case, as to the defendant's guilt, to bring in a verdict which resulted in the death penalty?

JUROR DENNIS: Well, for what this is, I'd have to say yes.

MR. PIERCE: In a rape case, you couldn't do it?

JUROR DENNIS: Right."

Concerning Beaver the record discloses:

"MR. PIERCE: Okay, let me ask you this question now. Would it be impossible for you, Mr. Beaver, to bring in a verdict that required the imposition of the death penalty in this rape case, would it be impossible for you to bring in such a verdict, even though the State had proven by evidence and beyond a reasonable doubt that the defendant Tommy Noell is guilty? Now, think about that right carefully, please, sir.

JUROR BEAVER: I believe it would.

MR. PIERCE: Well, could you listen to his Honor, and the charge of the court, as to the law in this case, on the law after listening to the evidence, and then if you are satisfied beyond a reasonable doubt that he is guilty, can you bring in a verdict, knowing that it carries the death penalty?

JUROR BEAVER: No sir, I would not.

MR. PIERCE: You would not, under any circumstances, do it?

JUROR BEAVER: No, sir."

It is clear from their answers in the record upon *voir dire* examination that each of these prospective jurors, before hearing any of the evidence, had already made up his mind that he would not return a verdict in this rape case pursuant to which the defendant might lawfully be executed, whatever the evidence might be. Under *Witherspoon* and the decisions of this Court cited above, we hold that these three jurors were properly excused for cause.

Defendant also included prospective juror Goyer in the above assignment. This juror, contrary to the argument in defendant's brief, was excused by the State by a peremptory challenge. Hence, defendant's argument as to the challenge for cause is not pertinent.

[5]  Defendant next contends that "the trial court erred in refusing to excuse for cause a juror who indicated an unwillingness to return a verdict of not guilty even if after hearing the evidence, he should have a reasonable doubt about defendant's guilt."

During the jury selection defendant's counsel inquired of Juror Morgan, "If there was any reasonable doubt in your mind, regardless of the balance of the evidence, you couldn't at this time say that you would return a verdict of not guilty?" Juror Morgan replied, "I am not too sure." Counsel moved that this juror be removed for cause. After this exchange, the court instructed the juror that if he had a reasonable doubt about defendant's guilt, it would be his duty to return a verdict of not guilty, and then inquired, "Would you do so, or would you find him guilty, even though you had a reasonable doubt about his guilt?" The juror replied that if he had a reasonable doubt, he would not find him guilty, if it was strong enough. Thereafter the juror told the court that he would not hesitate to return a verdict of not guilty if he had a reasonable doubt as to his guilt. The court then told defendant's counsel that he could examine the juror further and that his challenge for cause was overruled for the time being. Defendant's counsel asked no further questions and later excused this juror peremptorily. No abuse of discretion is shown in the trial court's refusal to excuse this juror for cause. This assignment is overruled.

[6]  Defendant next contends that the trial court committed prejudicial error in not further instructing the jury to dis-

regard certain hearsay testimony. This testimony resulted from an examination of the prosecuting witness and appears in the record as follows:

"Q. MR. PIERCE: What was the purpose of you going to the hospital, if you will tell the members of the jury?

A. MISS DICENZO: Because at that time, I intended to prosecute the man that I had identified as assaulting me, and it's necessary in these cases to have a medical examiner confirm this, and I also wanted a little medical treatment for some other things. After that I looked in a mirror and saw that I had hemorrhages in my eyes, some bruises on my arms and a bruised area on my back. There were some ruptured blood vessels in my face. I had my face rubbed in the rug. So, I was a mess.

Q. MR. PIERCE: Now, what was that you said about your eyes?

A. MISS DICENZO: Subcutaneous hemorrhages, *surgical nurse told me that they result from screaming,* and I don't know whether that's a pressure thing or not.

MR. EPTING: Objection.

COURT: Sustained.

MR. EPTING: Move to strike.

COURT: Motion is allowed. Do not consider what someone told this witness; dismiss that from your minds." (Emphasis added.)

Defendant now claims that "the Court's instruction to the jury was so short and without force that defendant's rights were not protected and in fact were prejudiced thereby." Miss DiCenzo had previously testified that she had subcutaneous hemorrhages about her eyes and that she did a lot of screaming during the attack. Mrs. Mary Ford, a nurse at North Carolina Memorial Hospital who helped examine Miss DiCenzo, had also previously testified that Miss DiCenzo had subcutaneous hemorrhages about her eyes. This fact was then amply established. In *State v. Childs,* 269 N.C. 307, 152 S.E. 2d 453 (1967), this Court held that where hearsay evidence that is of minor importance and relates to matters amply established by other competent evidence is immediately withdrawn by the court

upon defendant's objection, and the jury is instructed to disregard it, any prejudice in the admission of such evidence is cured. It is presumed that the jurors followed the court's instructions in this case to disregard this evidence and to dismiss it from their minds. Justice Sharp in *State v. Moore,* 276 N.C. 142, 171 S.E. 2d 453 (1970), quoted with approval from *State v. Ray,* 212 N.C. 725, 194 S.E. 2d 482 (1938), wherein it was stated:

> ". . . [O]ur system for the administration of justice through trial by jury is based upon the assumption that the trial jurors are men of character and of sufficient intelligence to fully understand and comply with the instructions of the court, and are presumed to have done so. *Wilson v. Mfg. Co.,* 120 N.C. 94, 26 S.E. 629."

In the present case the court's prompt action in sustaining defendant's objection, allowing his motion to strike, and instructing the jury not to consider what the surgical nurse told her—and to dismiss that from their minds—was sufficient to eliminate any possible prejudice to defendant. This is particularly true since defendant's counsel did not request any more specific instruction to the jury. *State v. Childs, supra.* This assignment of error is overruled.

[7] Mrs. Mary Ford, the nurse at the hospital where the prosecutrix was examined, testified as follows:

> "Q. MR. PIERCE: Now Miss Ford, Mrs. Ford, were any tests conducted there at the hospital on Miss DiCenzo?
>
> A. MRS. FORD: Yes; there were.
>
> Q. MR. PIERCE: What were they, if you know of your own knowledge?
>
> A. MRS. FORD: There were slides done, surgical secretion, bubble secretion, which is normal procedure in any normal rape case.
>
> MR. EPTING: Objection.
>
> COURT: Sustained.
>
> MR. EPTING: Move to strike.
>
> COURT: The motion is allowed. Do not consider that last statement.

Q. MR. PIERCE: Were you present when a vaginal examination was done on this lady?

A. MRS. FORD: Yes, I was.

Q. MR. PIERCE: Since you're not a physician, don't undertake to give your opinion, but were you there during the entire time that the examination took place?

A. MRS. FORD: Yes, sir; I was.

Q. MR. PIERCE: Where is the doctor?

A. MRS. FORD: At the present?

Q. MR. PIERCE: Yes.

A. MRS. FORD: I don't know.

Q. MR. PIERCE: Is he on vacation?

MR. EPTING: Objection.

COURT: Overruled, if she knows.

A. MRS. FORD: I don't know.

COURT: Sustained. Don't consider that."

Again defendant contends that the court's instruction to the jury was so meager as to be ineffective in calling the attention of the jurors to the fact that her statement, "which is normal procedure in any normal rape case," should in no way be taken as evidence of rape in this case. The nurse did not attempt to testify as to the results of the examination or the tests conducted on Miss DiCenzo, and in reply to questions concerning the whereabouts of the doctor who performed these tests, she stated that she did not know. In both instances the court instructed the jurors not to consider the answers by the witness. Again we see no merit to this contention. *State v. Moore, supra; State v. Childs, supra.*

[8] Captain Blackwood, while testifying for the State, indicated that he talked with Miss DiCenzo on the day of the alleged rape. Then the solicitor inquired, "And as a result of that conversation, and what transpired there, did you make an arrest later?" Defendant properly contends that the question was leading. But defendant also contends that the phrase "and what transpired there" prejudiced defendant in his right to

State v. Noell

have only sworn witnesses whom he could cross-examine give evidence against him. This, defendant contends, required reversal. We are not persuaded by defendant's arguments. Generally, the rulings by the trial judge on the use of leading questions are discretionary and are reversible only for abuse of discretion. *State v. Staten*, 271 N.C. 600, 157 S.E. 2d 225 (1967); 1 Stansbury's N. C. Evidence, Brandis Rev. § 31 (1973), and cases therein cited. Absent a showing of abuse of discretion by the judge and prejudice to the defendant, the rulings of the trial judge will not ordinarily be disturbed. *State v. Painter*, 265 N.C. 277, 144 S.E. 2d 6 (1965); *State v. Cranfield*, 238 N.C. 110, 73 S.E. 2d 353 (1953). Captain Blackwood simply testified that as a result of his investigation he made an arrest later. No abuse of discretion and no prejudice to defendant is shown by this statement. This assignment is without merit.

[9] Defendant contends his rights to obtain and preserve evidence and his rights to a fair trial were violated when the police did not take immediate action following his arrest in the following respects: (1) Interview defendant's alibi witness; (2) place the watch found in Miss DiCenzo's apartment on defendant's wrist to see if it matched the impression that Captain Blackwood stated he observed on defendant's wrist; (3) check defendant's outer garments, underwear, fingernails and other body parts; (4) seize the shirt that officers testified they saw hanging on a line at defendant's home; (5) search the vehicle allegedly driven by the attacker; and (6) obtain a search warrant to search the premises occupied or used by defendant.

Defendant has grouped together these possible investigative techniques and claims that the failure to do them prejudiced his substantial right to a fair trial. In support of this contention, he cites a number of cases including *United States v. Marion*, 404 U.S. 307, 30 L.Ed. 2d 468, 92 S.Ct. 455 (1971); *Dickey v. Florida*, 398 U.S. 30, 26 L.Ed. 2d 26, 90 S.Ct. 1564 (1970); *Smith v. Hooey*, 393 U.S. 374, 21 L.Ed. 2d 607, 89 S.Ct. 575 (1969), all of which, however, relate either to a delay in arresting a defendant or bringing his case to trial. As stated by defendant in his brief, "The gist of this line of cases is well summarized by *United States v. Marion*, which holds that if defendant at trial can demonstrate actual prejudice resulting from such delay, then his prosecution will

State v. Noell

be barred." In the present case defendant was arrested the day of the alleged offense, and no contention is made about any delay in bringing the case to trial. The record reveals that the alleged offense was committed 23 May 1973 and defendant's trial began on 30 July 1973.

Moreover, the record does not disclose that defendant asked the police to take any action concerning checking his alibi, securing search warrants, or making other investigations. Defendant also assumes that if the police officers had taken the action about which he complains, the results of such action would have proved him innocent. Such reasoning is, of course, purely speculative and furthermore is not supported by the evidence in this case. In *State v. Maloney,* 105 Ariz. 348, 464 P. 2d 793 (1970), cert. den. 400 U.S. 841, 27 L.Ed. 2d 75, 91 S.Ct. 82 (1970), it was held that even though the police officers threw away certain articles found at the scene of a bedroom homicide, this would not be sufficient to overturn a murder conviction where the officers apparently acted in good faith and the probative effect of laboratory examination of these items was speculative. In so holding that Court quoted with approval the following language from *People v. Tuthill,* 31 Cal. 2d 92, 187 P. 2d 16 (1947) : "There is no compulsion on the prosecutor to call any particular witness or to make any particular tests so long as there is fairly presented to the court the material evidence bearing upon the charge for which the defendant is on trial." Here, no deliberate destruction of evidence or deliberate failure to obtain evidence to prevent its use has been demonstrated or even argued.

Defendant contends that the failure of the Carrboro Police Department to interview his alibi witness for approximately six days violated his constitutional rights and prevented him from getting a fair trial because the witness, when interviewed, could not remember what day he saw defendant.

This contention assumes that had the Carrboro Police Department checked out his alibi immediately, Bill Austin of Bronson's Tire Company would have testified that he talked to defendant on 23 May, the day of the alleged assault on Miss DiCenzo. This, however, in addition to being mere speculation, is also contrary to other evidence presented in the case. Another witness, Roy Locke of Snelling and Snelling employment service,

testified that he talked with defendant in his office in Chapel Hill about eight o'clock in the morning on 22 May, the morning defendant was supposed to go to Durham for the interview with Bronson's Tire Company. Locke further testified that the interview with Bronson's Tire Company had been arranged on 21 May, that it was scheduled for 22 May, and that he did not make any change in the interview time. The case for the interview having been on 22 May rather than 23 May is also supported by the appointment card introduced by the State which provided: "Mr. Bill Austin, Service Manager, Bronson's Tire Company, 1014 North Main Street, Durham, 5-22-73; time 9:00 a.m." Further, the witness from Bronson's Tire Company, Bill Austin, testified that he received a call from Snelling and Snelling on what he believed was 21 May informing him that defendant would be coming over, and this tends to corroborate Locke's testimony about the interview being set up on 21 May for 22 May. No evidence was presented to the court below that indicated the interview time had been changed from 22 May to 23 May. Additionally, the testimony of Mrs. Barbara Noell, wife of defendant, that she was with her husband from 7:50 in the morning until noon on 22 May—and that consequently defendant could not have gone to Durham on that day—was contradicted not only by the witness Roy Locke but also by defendant himself when he took the stand the second time.

Defendant's contentions regarding the failure of the police officers to place the watch found at the scene of the attack on defendant's wrist to see if it matched the impression observed, to check defendant's clothing, and to search his car and premises for other items are grouped together for the purpose of discussion. Defendant contends that had this evidence been obtained, there is a strong possibility it would have shown him innocent. This does not necessarily follow. Even had the clothing been obtained and subjected to examination and found not to contain any evidence connecting defendant with the attack, this would not prove him innocent. Such evidence would have been neutral in character and would not have shown guilt or innocence. This is also true concerning any items which might have been found in the car or in his home. There is no showing that the investigation wanted by defendant would have produced evidence that had any bearing whatsoever on the outcome of this case. Here, Miss DiCenzo positively identified defendant as her attacker. She testified that she saw him on three occasions before he entered her room—the first time on Highway 54 Bypass, the sec-

ond time when he drove to the curb and she passed him in the apartment complex, and the third time when he drove by her after she had parked her car and just prior to her entering her apartment. This was during daylight hours. She further testified that when defendant entered her room she talked to him for a few minutes prior to the attack, that she saw him during the attack, that in all he was in the apartment for about thirty minutes, that it was daylight and that she could see his face, and that she had no doubts whatsoever that defendant was the man who attacked her.

Police officers are under no duty to take any particular course of action when investigating a crime. Of course, they cannot suppress evidence. *Brady v. Maryland,* 373 U.S. 83, 10 L.Ed. 2d 215, 83 S.Ct. 1194 (1963). They are not required, however, to follow all investigative leads and to secure every possible bit of evidence, and their failure to do so is not prejudicial error. In *People v. Baber,* 31 Mich. App. 106, 187 N.W. 2d 508 (1971), the failure of the police to check footprints in the snow, to test a gun found at the scene of the crime for fingerprints, to check a broken window and screen for fibers of clothing, or otherwise take fingerprints in the house was held not to give rise to a valid claim of a constitutional denial of due process.

We hold that these assignments are without merit.

[10]. During cross-examination of defendant by the solicitor, the following exchange occurred:

"Q. MR. PIERCE: Now Mr. Noell, you testified in details about the times on May 23 [1973]. Tell us about May 23, 1972; what did you do that morning?

MR. EPTING: Objection.

THE COURT: Overruled.

A. MR. NOWELL: I do not know where I was on May 23, 1972."

In his brief defendant states that the solicitor "obviously intended to imply to the jury by the defendant's inability to remember where he was on May 23 one year before the assault that his memory as to where he was on May 23, 1973, was also not to be believed." For this reason, defendant argues, the court committed prejudicial error in allowing the question to be asked.

While defendant in a criminal action may not be required to become a witness unless he voluntarily does so, G.S. 8-54, once he does so he becomes subject to cross-examination and may be required to answer questions designed to impeach or discredit him as a witness. *State v. Williams*, 279 N.C. 663, 185 S.E. 2d 174 (1971) ; *State v. Wilson*, 217 N.C. 123, 7 S.E. 2d 11 (1940).

Defendant also argues that the question should not have been admitted because it was not relevant to the case. "Strictly speaking, evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue in the case. Evidence which has no such tendency is inadmissible, although its admission will not constitute reversible error unless it is of such a nature as to mislead the jury or prejudice the opponent." 1 Stansbury's N. C. Evidence, Brandis Rev. § 77 (1973). Assuming the question was not relevant, defendant in this case has made no showing that the jury was misled or that defendant was prejudiced. Therefore this assignment is overruled.

[11] Defendant next contends that the solicitor argued improperly and outside the record when he commented on the contention of the defense during the trial that the Carrboro Police Department had not done all they could to preserve the evidence concerning the crime. During the trial and the closing jury argument the defense had repeatedly contended that the police should have taken immediate steps to obtain search warrants and gather evidence that, as the defendant contends, would have tended to prove that defendant did not commit the offense charged. In response to this contention, the solicitor in his closing argument stated:

> "But gentlemen, is it reasonable to believe that the Carrboro Police should throw aside all their other cases, look, we can't mess with this, any of this stuff, we have this rape case and we have to proceed and concentrate all efforts for days on one thing, while other people who break the law, go wild in all other matters. Is it reasonable to expect that the Carrboro Police Department would do that?"

It is well settled that counsel are entitled to argue to the jury all the law and facts that are in evidence and all reasonable inferences that may be drawn therefrom. But it is also the rule that counsel may not "travel outside the record" and inject into his arguments facts of his own knowledge or other facts not

included in the evidence. *Crutcher v. Noel,* 284 N.C. 568, 201 S.E. 2d 855 (1974); *Cuthrell v. Greene,* 229 N.C. 475, 50 S.E. 2d 525 (1948); *State v. Little,* 228 N.C. 417, 45 S.E. 2d 542 (1947); *Perry v. R. R.,* 128 N.C. 471, 39 S.E. 27 (1901). However, as stated in 2 Strong, N. C. Index 2d, Criminal Law § 102 (1967):

> "The control of the argument of the solicitor and counsel must be left largely to the discretion of the trial court, and an impropriety must be sufficiently grave to be prejudicial in order to entitle defendant to a new trial. It is only in extreme cases of abuse of the privilege of counsel, and when the trial court does not intervene or correct an impropriety, that a new trial may be allowed."

No such case of abuse is presented here, and under the circumstances in this case, this portion of the solicitor's argument does not represent an impropriety so sufficiently grave as to be prejudicial.

[12] Defendant also contends that the trial court erred in overruling an objection to the following statement made by the solicitor during his final argument to the jury: "Mr. Epting did a good job for the client he had. It's his job to defend the man. I'm talking about the witnesses who took the stand. I submit to you, that they have lied to you."

In *State v. Miller,* 271 N.C. 646, 157 S.E. 2d 335 (1967), this Court held that it was improper for the solicitor to argue, "I *knew* he was lying the minute he said that." (Emphasis added.) In that case this Court stated: "It is improper for a lawyer in his argument to assert his opinion that a witness is lying. *He can argue to the jury that they should not believe a witness,* but he should not call him a liar." (Emphasis added.)

In the present case the solicitor did not call the defense witnesses liars. He submitted that question to the jury for its determination when it made its findings and returned its verdict. The State had presented to the jury direct evidence that defendant was the individual who committed the assault upon the prosecutrix. The State had also presented evidence that showed that defendant's wife and defendant himself had given different stories concerning the whereabouts of defendant on 22 May. All of this evidence was contrary to the testimony of the witnesses for defendant concerning his whereabouts on that date. There-

fore, the remarks of the solicitor represented a reasonable comment on the evidence.

[13] Defendant further contends that the solicitor injected defense counsel's personality into the jury's consideration when he stated, "I certainly don't intend to be critical of Mr. Epting, as I said he's done a fine job in defending his client. When you don't have a defense, you do the best you can." It was the solicitor's contention that the evidence for the State overwhelmingly showed defendant's guilt, and the evidence for defendant was at best self-serving and contradictory. In *State v. Williams*, 276 N.C. 703, 712, 174 S.E. 2d 503, 509 (1970), it is stated:

> "In this jurisdiction wide latitude is given to counsel in the argument of contested cases. Moreover, what constitutes an abuse of this privilege must ordinarily be left to the sound discretion of the trial judge. *State v. Bowen*, 230 N.C. 710, 55 S.E. 2d 466. . . . "

Defendant further contends that prejudicial error was committed when the solicitor in his argument stated, "You know when your defense is mighty weak, it is common to employ— — — — " Defendant immediately interrupted by objecting before the statement was completed, and the court sustained the objection. Defendant contends, however, that since no instruction to disregard the remark was given that this was prejudicial error. This remark could hardly be prejudicial to defendant because nothing was really said. The objection was made to what the defense counsel anticipated the solicitor would say and the objection was sustained by the court.

[14] The solicitor during his final argument to the jury also made the following comments:

> "Now, the [prosecutrix] says that the man who came in was Mr. Noell, and who she positively identified as Mr. Noell over there. And let me add, at this point, by his own admission, he had two strikes already. So, remember that in evaluating his testimony, gentlemen. You were listening to a man that admitted he had pled guilty one time to willful and wanton injury to real property, and he had pled guilty to assault and battery by his own admission.

> "Two strikes. Now, gentlemen, three and you're out. That's the way the game goes. I don't mean this is a game,

this is justice. This not a game, in the sense that we're talking about sports."

Defendant contends that by these remarks the solicitor improperly argued that defendant's character as evidenced by his previous criminal convictions could be considered as substantive evidence of his guilt rather than as just impeachment evidence going to defendant's credibility. Furthermore, defendant contends that the trial judge on his own initiative should have corrected the solicitor at the time the alleged improper argument was made or at least have charged the jury later on the law of character evidence.

Defendant made no objection to what he now contends was improper argument by the solicitor, nor did he request an instruction to the jury about the significance of character evidence. An objection to argument comes too late after verdict. *State v. Williams,* 276 N.C. 703, 174 S.E. 2d 503 (1970); *State v. Lea,* 203 N.C. 13, 164 S.E. 737 (1932), cert. den. 287 U.S. 649, 77 L.Ed. 561, 53 S.Ct. 95 (1932). " . . . [T]he comment of counsel upon the testimony and conduct of parties and witnesses 'must be left, ordinarily, to the sound discretion of the judge who tries the case; and this Court will not review his discretion, unless it is apparent that the impropriety of counsel was gross and well calculated to prejudice the jury.' *Jenkins v. Ore. Co.,* 65 N.C. 563; *S. v. Tyson,* 133 N.C., 698; *S. v. Davenport,* 156 N.C., 597; *Maney v. Greenwood,* 182 N.C., 579." *Lamborn v. Hollingsworth,* 195 N.C. 350, 142 S.E. 19 (1928). There is nothing in this record that indicates an abuse of that sound legal discretion committed by law to the trial judge.

In the absence of a request, the trial judge is not required to charge the jury as to the significance of character evidence. 1 Stansbury's N. C. Evidence, Brandis Rev. § 108 (1973). See *State v. Goodson,* 273 N.C. 128, 159 S.E. 2d 310 (1968); *State v. Norkett,* 269 N.C. 679, 153 S.E. 2d 362 (1967); *State v. McKinnon,* 223 N.C. 160, 25 S.E. 2d 606 (1943). No such request was made in this case.

[15] Defendant by his next assignment of error attacks the charge on the ground that the court in reviewing what defendant's evidence tended to show did not refer specifically to certain portions of defendant's testimony, and that defendant was prejudiced by these omissions.

The charge of the court to the jury must be construed contextually, and segregated portions will not be held prejudicial error when the charge as a whole is free from objection. 3 Strong, N. C. Index 2d, Criminal Law § 168 (1967). The trial judge instructed the jury that he had not tried to refer to all the evidence and that they should be guided by their own recollection of the evidence and not what he said. "In instructing the jury the court is not required to recapitulate all of the evidence. The requirement of G.S. 1-180 that the judge state the evidence is met by presentation of the principal features of the evidence relied on respectively by the prosecution and defense. A party desiring further elaboration on a subordinate feature of the case must aptly tender request for further instructions." *State v. Guffey*, 265 N.C. 331, 144 S.E. 2d 14 (1965). Nothing more is required than a clear instruction that applies the law to the evidence and gives the position taken by the parties as to the essential features of the case. *State v. Thompson*, 257 N.C. 452, 126 S.E. 2d 58 (1962). The court's charge complies with the statutory requirement of G.S. 1-180. This assignment of error is overruled.

[16] By his next assignment of error defendant asserts that the trial court erred in failing to submit to the jury a charge of assault with intent to commit rape, defendant contending that the trial court should have submitted the lesser included offense because of the lack of concrete, independent proof of actual penetration in this case due to the prosecutrix's statement that she lost consciousness at various times while the actual assault was taking place.

"The trial court is not required to charge the jury upon the question of the defendant's guilt of lesser degrees of the crime charged in the indictment when there is no evidence to sustain a verdict of defendant's guilt of such lesser degrees." 3 Strong, N. C. Index 2d, Criminal Law § 115 (1967). In the present case defendant's defense was that of an alibi—that he was not present when the alleged offense occurred. He, therefore, completely denies assaulting the prosecutrix or forcing her to have sexual intercourse with him. The prosecutrix testified positively that after defendant had choked her and threatened to kill her, he forcibly and against her will had sexual intercourse with her, and that he did in fact penetrate her. Thus, there was no evidence of an assault with intent to commit rape, and the trial court was not required to charge on the lesser included offense.

State v. Noell

"G.S. 15-169 and G.S. 15-170 [providing for convictions of lesser included offenses] are applicable *only when there is evidence* tending to show that the defendant may be guilty of a lesser offense." *State v. Williams,* 275 N.C. 77, 88, 165 S.E. 2d 481, 488 (1969).

[17]  On direct examination counsel for defendant asked defendant's wife how long she and defendant had been married. She testified that they were married on 17 March 1973. On cross-examination, in response to a question from the solicitor, she stated that her child was due to be born on September 30. Defendant contends that this question sought to elicit information irrelevant to the issue in the case and that the solicitor's question should not have been allowed since it was highly prejudicial to the defendant in that its answer indicated to the jury that the baby had been conceived out of wedlock.

The record does not disclose that defendant objected to this question or moved to strike the answer. "Nothing else appearing, the admission of incompetent evidence is not ground for a new trial where there was no objection at the time the evidence was offered." *State v. Williams,* 274 N.C. 328, 334, 163 S.E. 2d 353, 357 (1968). See also *State v. Mitchell,* 276 N.C. 404, 172 S.E. 2d 527 (1970). However, we do not see how this testimony could be prejudicial to defendant. The witness was pregnant and her baby was due to be born in September. Her condition at the trial in August must have been apparent to the jurors. This assignment is without merit.

[18]  Finally, defendant contends that the death sentence imposed upon him is legally unauthorized and constitutes cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments to the United States Constitution.

In *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973), this Court declared that the death penalty is the sole and exclusive punishment for a rape under G.S. 14-21 committed in North Carolina after 18 January 1973. The rape for which this defendant has been convicted was committed on 23 May 1973. The death sentence was, therefore, not only proper but was the only one that the court below could impose. For a full review of the law in North Carolina pertaining to capital punishment, see *State v. Waddell, supra,* and *State v. Jarrette, ante,* 625, 202 S.E. 2d 721 (1974).

---

In view of the seriousness of the charge and the gravity of the punishment imposed, we have carefully examined each of defendant's assignments of error. Examination of the entire record discloses that defendant has had a fair trial free from prejudicial error.

No error.

Chief Justice BOBBITT, Justice HIGGINS and Justice SHARP dissent as to death sentence and vote to remand for imposition of a sentence of life imprisonment for the reasons stated in the dissenting opinion of Chief Justice Bobbitt in *State v. Jarrette,* 284 N.C. 625, 666, 202 S.E. 2d 721, 747 (1974).

Justice HIGGINS dissenting as to death sentence.

In my opinion a valid death sentence cannot be imposed in this State unless the Supreme Court of the United States reverses the holding in *Furman v. Georgia, or* unless the North Carolina General Assembly repeals the proviso for jury recommendation of life imprisonment.

The reasons for my views are stated in my concurring in result opinion in *State v. Waddell.* In Waddell this Court reversed (in effect vacated) the death sentence and remanded for a sentence of life imprisonment.

Since the Supreme Court of the United States has not modified the holding in Furman and since the North Carolina General Assembly has not repealed the proviso for jury recommendation of life imprisonment, I vote to vacate the death sentence and to remand for a sentence of life imprisonment.