## STATE v. WILLIE EDWARD STATEN.

(Filed 18 October, 1967.)

**1. Criminal Law § 181—**

In a hearing under the Post Conviction Hearing Act, a finding by the court that an indigent defendant had been denied right of appeal to the Supreme Court fully supports an order appointing counsel to perfect an appeal and directing the county to furnish a transcript of the trial. G.S. 15-4.1, G.S. 15-180, G.S. 15-221.

**2. Homicide § 20—**

The State's evidence tended to show that the defendant and two other persons were seen attacking the deceased on the street in the nighttime, that defendant's hands were making "swinging motions" over deceased's body, that a coat worn by defendant at the time of the attack and a knife were taken from defendant following his arrest, that tests performed on the coat revealed splotches of human blood, and that the deceased died from a stab wound in the chest. *Held:* The evidence was sufficient to go to the jury on the issue of defendant's guilt of murder in the second degree.

**3. Homicide § 14—**

Where the solicitor asked a witness if he had seen the defendant strike the deceased with his hands or fists, and the witness replied, "I seen motions, swinging motions", a motion to strike on the ground that the answer was not responsive to the question was properly denied, since the witness testified positively as to what he saw taking place between the defendant and the deceased.

**4. Criminal Law § 169—**

Where the court sustains an objection to a question asked on cross-examination, and the record fails to show what the witness would have testified, the exclusion of the testimony cannot be held prejudicial.

**5. Criminal Law § 87—**

The trial court has discretionary authority to allow the solicitor to ask a witness a leading question, and, in the absence of a showing of abuse of discretion, its rulings will not be reviewed on appeal.

**6. Criminal Law § 161—**

A mere reference in the assignment of error to the record page where the asserted error may be found is not sufficient, since an assignment of error must clearly present the error relied upon without compelling the Court to go beyond the assignment itself to learn what the question is.

**7. Criminal Law § 146—**

The Supreme Court may consider an assignment of error, although it is defective in compelling the Court to search the record to discover the purported error.

**8. Criminal Law § 158—**

Where the charge of the court is not included in the record, it will be presumed that the court properly instructed the jury as to the law arising upon the evidence.

APPEAL by defendant *in forma pauperis* from *Clarkson, J.,* 8 April 1963 Regular Criminal Session of MECKLENBURG.

Criminal prosecution upon an indictment charging defendant on 13 January 1963 with murder in the second degree of Ed Blake.

Defendant, an indigent, was represented by his court-appointed counsel, Elbert Foster, and entered a plea of not guilty. Verdict: Guilty of manslaughter.

From a judgment of imprisonment for not less than 15 years, defendant appeals to the Supreme Court.

*Attorney General T. W. Bruton, Deputy Attorney General Harry W. McGalliard, and Assistant Attorney General Millard R. Rich, Jr., for the State.*

*Grier, Parker, Poe & Thompson by A. Marshall Basinger for defendant appellant.*

PARKER, C.J. On 24 April 1967 defendant instituted a proceeding in the Superior Court of Mecklenburg County to review the constitutionality of his trial, pursuant to G.S. 15-217. This petition came on to be heard before Bailey, J., presiding at the 12 June 1967 Regular Schedule "C" Criminal Session of the Superior Court of Mecklenburg County. Defendant was represented by A. Marshall Basinger, a member of the Mecklenburg County Bar, who was appointed by the court to represent defendant who was an indigent. At the hearing defendant testified at length. We have a transcript of his testimony before us. After listening to the testimony, Judge Bailey entered a judgment in substance as follows: That the petitioner was tried at the 8 April 1963 Regular Criminal Session of the Superior Court of Mecklenburg County; that he was represented at said trial by Elbert Foster, who had been appointed by the court to represent him and who also represented him at the preliminary hearing; that petitioner entered a plea of not guilty, and was found guilty of manslaughter by a jury and sentenced to a term of 15 years in prison, which he is now serving; that the petitioner attempted to give notice of appeal and appeal his case to the Supreme Court and was not able to do so, and that in this there was a substantial denial of his right to appeal secured to him by the Constitution of the State of North Carolina. Based upon said findings, Judge Bailey adjudged that the petitioner shall be allowed to appeal to the Supreme Court of the State of North Carolina; that the County of Mecklenburg shall provide him with a transcript of his trial at the 8 April 1963 Regular Criminal Session; that he shall be allowed to perfect said appeal *in forma pauperis,* and A. Marshall Basinger was appointed to represent said petitioner and to perfect his appeal. The tran-

script of the evidence at the hearing before Judge Bailey amply supports Judge Bailey's recital of facts.

The defendant testified in substance: He told Mr. Foster to appeal the case. Foster told him he had been made fool enough out of the case and that he did not want anything else to do with it, and he refused to appeal the case. Defendant's mother and stepfather went to Mr. Foster and asked him to appeal the case, and he would not. He filed no notice of appeal. When defendant was committed to prison, he wrote to the clerk of the Superior Court of Mecklenburg County several times trying to get a transcript and trying to find out how his case could be appealed to the Supreme Court. The answers he received from the clerk's office did not pertain to what he was writing about, and he could not get the information that he wanted until this year when he finally learned how to write a writ. This is the defendant's version. So far as the record discloses Mr. Foster did not testify, nor is there anything to show that he was given an opportunity to testify.

G.S. 15-180 provides: "In all cases of conviction in the Superior Court for any criminal offense, the defendant shall have the right to appeal. .' . ." G.S. 15-221 provides in substance, except when quoted, that the judge upon hearing a petition for a review of the constitutionality of his trial, if he finds with the petitioner, "shall enter an appropriate order with respect to the judgment or sentence in the former proceedings under which the petitioner was convicted, and such supplementary orders as to rearraignment, retrial, custody, bail or discharge as may be necessary and proper."

When Judge Bailey found at the hearing that defendant had been denied a substantial constitutional right, to wit, his right to appeal his case to the Supreme Court, he was correct in ordering his counsel to perfect an appeal from his trial at the 8 April 1963 Regular Criminal Session of Mecklenburg, and in ordering the county to furnish to him a transcript of his trial before Judge Clarkson. G.S. 15-4.1; G.S. 15-180; G.S. 15-221; *S. v. Roux,* 263 N.C. 149, 139 S.E. 2d 189; *Douglas v. California,* 372 U.S. 353; 9 L. Ed. 2d 811, reh. den. 373 U.S. 905, 10 L. Ed. 2d 200; *Griffin v. Illinois,* 351 U.S. 12, 100 L. Ed. 891, 55 A.L.R. 2d 1055, reh. den. 351 U.S. 958, 100 L. Ed. 1480; *Draper v. Washington,* 372 U.S. 487, 9 L. Ed. 2d 899; 43 N.C.L. Rev. 596.

This is a summary of the testimony in the trial at the 8 April 1963 Session before Judge Clarkson and a jury, except when quoted: About midnight on 13 January 1963 a witness, Larry Boyer, age 20, who knew defendant Willie E. Staten, left his girl friend's house and proceeded up Myers Street in the city of Charlotte until he came to the intersection of that street and Watkins Lane from which point

and at a distance of less than half a block he observed three figures attacking a man. There was a street light about two feet from where this scuffle was taking place and he was able to recognize defendant Willie E. Staten as one of the assailants. He then proceeded to within about five feet of the scene. He saw defendant Staten and Ed Blake, the victim, scuffling and tussling in the street. He heard Ed Blake say, "Please don't hit me anymore. I don't have any money." He did not see Willie Staten strike Ed Blake with his hands or fists, but he saw swinging motions. After seeing Willie Staten and Ed Blake on Myers Street, he turned around and ran back down the street to his girl friend's house. When asked upon cross-examination why he did this, he stated, "When I left my girl friend's house I was going home. I didn't go home because I wasn't going to walk past nobody looking for a fight." He saw defendant again that night at the intersection of Myers Street and Second about five minutes after Blake was taken to the hospital. He had a conversation with defendant. He testified as follows: "(H)e asked me said, 'What is happening, Baby?' and I said, 'Ain't nothing happening.' I said, 'You all just damn near killed that old man.' He said, 'Who is, Baby, you don't know nothing and I don't know nothing.' At that time he and Jesse Earl Brown and June Lindsey were all together. What he really said after I told him that he had damn near killed the old man, he said, 'Cool it, Baby, you don't know nothing and I don't know nothing.' " Willie Staten had on a sweater with different patterns of color in it and he had on a long white coat. The last time Boyer saw Ed Blake he was lying out there at the intersection of Myers and Second in a pool of blood, moaning and begging somebody to call somebody for some help. Boyer did not know how Ed Blake got from where he was being attacked to the intersection of Myers and Second Street where he was lying in a pool of blood.

Dr. W. M. Summerville, who is a medical doctor, saw the body of the deceased victim, Ed Blake, on 13 January 1963 at a funeral home. He performed an autopsy and a blood alcohol test. From the autopsy and alcohol test, he can say definitely that Ed Blake was under the influence of alcohol at the time of his death and, in his opinion, Ed Blake died as a result of a stab wound in the chest, with resulting hemorrhage.

W. E. Dew, a member of the Charlotte Police Department in the Detective Bureau, saw the defendant shortly after he was arrested. He questioned him at the police department about a coat and defendant said that he had been wearing it on 13 January 1963. He questioned him concerning some flecks of some substance on the

coat which appeared to be blood. He asked defendant to explain substances on his shoes, and defendant stated that there was nothing on the shoes because he had had them cleaned and polished the preceding day. He questioned defendant about a knife. Defendant stated that he got the knife some two weeks earlier from a friend, and that the knife just happened to be in his possession when he was arrested. The blade was approximately three and one-half inches long. He questioned him concerning the substance on the blade of the knife. Defendant said he knew nothing about any substance on the knife, but if there was a substance on it, it had gotten there before he got the knife. Dew told defendant that he wanted to have the coat and the knife examined at the State Bureau of Investigation to determine what the substance was that was on them. Defendant made no objection. Thereafter, Dew took the knife and the coat to the laboratory of the State Bureau of Investigation in Raleigh.

William S. Best is employed by the North Carolina Bureau of Investigation as a chemist. He has received an A.B. degree in chemistry and has done graduate work at the University of North Carolina. He conducted an examination of some spots found on the left sleeve of the long white coat which the evidence tended to show the defendant was wearing on the occasion in question. Mr. Best cut these spots out and ran a series of laboratory tests thereon for the purpose of ascertaining whether these spots were produced by blood and, if so, whether it was human blood. He testified that in his opinion the tests revealed that the substance was human blood. He made tests for blood on the knife also, but the quantity of blood thereon was insufficient to enable him to be completely sure that it was human blood.

Charles Miles testified in substance: After midnight on 13 January 1963 back of Big Wheel's house, he heard defendant bragging about how good his knife was, and defendant took it out and showed it to him. When Miles met defendant in the Big Wheel liquor joint, defendant told him that he (Miles) should have been ashamed of himself for killing that old man.

Defendant testified in substance, except when quoted, as follows: About 1:30 on the night in question he and one James Dickson went down Caldwell Street to Second Street. When he got to Second and Myers, he saw blood in the street. Some man was coming down the street from First Street. He did not see Larry Boyer at that time. He had not been in the vicinity of Second and Myers Street before that time that night. About that time Jesse Earl Brown and June Lindsey were coming up from McDowell Street. He asked Jesse Earl Brown where his sister was. About that time he saw Larry Boyer on

his porch near the grocery store where Ed Blake was supposed to have been killed. When he asked Brown where his sister was, he stated that she was down at the Elks, and he said, "I'll be around there after a while." Larry Boyer came from a porch about three or four houses from the grocery store, crossed the street, and walked over to a parked car. He heard them talking. Larry Boyer told Jesse Earl Brown "that him and Charlie Brown had stabbed a man — Charles Miles had stabbed the man." Jesse Earl asked him what had happened that night. He said, "Come across the street and I will tell you." Defendant left there and went down to McDowell Street, and went to an alley that leads to Big Wheel's house. When he got to Big Wheel's house, he was standing in the kitchen when Larry Boyer and Charles Miles both came in the back door, and they went in the middle room and were drinking something. A few minutes later they came out of the middle room and went in the rest room. Charles Miles asked Larry what did he want to stab that man for. Defendant said, "Larry, why did you all want to do something like that?" Then defendant left Big Wheel's liquor joint and went down the alley, and both Miles and Boyer came out just behind him. As they were approaching McDowell Street, they saw a police car and they "broke out and started running." Defendant did not run. Later all of them got back together and went up First Street to Houston's club. They started singing and as they were doing so the police came down by Grier's Funeral Home. The others "broke out and ran again," but he did not. He did not pull out a knife when he was down at Big Wheel's. He did not have a knife. He did not show a knife to anyone nor tell them that it was "mighty sharp" nor words to that effect. He had no knife on his person. When a colored officer told him on Second Street on Monday that the captain of detectives wanted to talk to him, he asked him if he had a knife on him. He said, "Yes," and reached in his pocket and gave the colored officer the knife. He went to the police station about 6 p.m. on Monday just after he had given the knife to the officer. The police officer, Mr. Dew, had questioned defendant about five or six times about spots on the sleeve of his coat and told him that they wanted to check the raincoat out. Defendant told him that that was all right, and gave him the raincoat. Mr. Dew came back after that and said that there were some specks on it, and defendant told him that they came from his mother and stepfather. Defendant also told him that he had no objection to his shoes being analyzed, and that he got the knife from a boy that stays down on Cherry Street. Defendant said he did not have the knife with him on the night of January 13. He had "never cut anybody with that knife." He did not stab Ed

Blake. He had never seen the man before in his life. He knows nothing about Blake, and the only time he saw Blake was when they showed him the pictures at the detective's office.

Defendant offered the testimony of his mother, who testified in substance: On Christmas Eve she and her husband fell out and her husband hit her and blood was dropping all over her. She fell into defendant's arms while she was bleeding, at which time her son had on his raincoat and his black shoes.

The evidence was amply sufficient to carry the case to the jury. 2 Strong's N. C. Index 2d, Homicide, §§ 5, 6, 13, and 20. Defendant's assignment of error that the court erred in denying his motion for judgment of compulsory nonsuit at the close of all the State's evidence is overruled.

The prosecuting officer for the State asked Larry Boyer, "Did you ever see Willie Staten ever strike Ed Blake with his hands or fists?" He answered, "I seen motions, swinging motions." The defendant made a motion to strike that answer as not being responsive to the question. The court overruled the motion. The defendant assigns as error the failure of the court to strike the answer. This assignment of error is overruled, because the answer was a direct answer as to what the witness saw with respect to the defendant and the deceased Blake. See *In re Will of Tatum,* 233 N.C. 723, 726, 65 S.E. 2d 351, 353.

The prosecuting officer for the State asked this question of Larry Boyer on direct examination: "The motions that you say that the defendant Staten made to Ed Blake, will you describe those motions, how they were made." The defendant objected. The court overruled the objection, and the witness answered as follows: "They were scuffling, like any two people scuffling, struggling." Defendant contends that "the court abused its discretion in allowing the State to question its own witness in a manner that amounted to a leading misstatement of the witness' testimony, such question also being repetitious and highly prejudicial to the defendant appellant." This assignment of error is without merit and is overruled.

On cross-examination counsel for defendant asked Larry Boyer this question: "What caused you to get some — after determining to go home, to go out and go down to Big Wheel's and get something to drink there and go over to Houston's place past your home and get liquored up there, what caused you to do those things?" The solicitor objected. His objection was sustained, and defendant assigns this as error. The answer to the question is not in the record. Defendant contends that this was error because the rule that an exception to the exclusion of testimony will not be considered where

the record does not show what the answer of the witness would have been had he been permitted to testify does not apply when the question is asked an adversary witness on cross-examination. The defendant cites in his brief in support of his assignment of error *S. v. Huskins*, 209 N.C. 727, 184 S.E. 480. The rule relied upon by defendant as stated in the *Huskins* case was disapproved by the Supreme Court in *S. v. Poolos*, 241 N.C. 382, 85 S.E. 2d 342, and is no longer the law in North Carolina. This assignment of error is overruled upon authority of the *Poolos* case.

Defendant assigns as error, based upon nine exceptions, that the court abused its discretion in repeatedly allowing the State to ask leading questions of its witnesses. This assignment of error does not comply with the Rules of this Court in that we cannot discover from the assignment of error itself what questions are challenged unless we go on a voyage of discovery throughout the record. *S. v. Coleman*, 270 N.C. 357, 154 S.E. 2d 485. This is stated in Stansbury's N. C. Evidence, 2d Ed., § 31 at 59: "The allowance of leading questions is a matter entirely within the discretion of the trial judge, and his rulings will not be reviewed on appeal, at least in the absence of a showing of abuse of discretion." We have gone on a voyage of discovery through the record and it is manifest that no abuse of discretion of the trial judge is shown. This assignment of error is overruled.

Defendant assigns as error that upon direct examination by his counsel of his mother, who was a witness in his behalf, she was asked this question, "Did he at any time say other than he had had anything to do with this?" The State objected, and the objection was sustained. Then she was asked, "What did he tell you?" The objection of the solicitor for the State was sustained. Then she was asked this question by his counsel, "For corroboration, what did he tell you with reference to this?" The State's objection was sustained, and defendant excepted and assigns this as error. He contends that this hampered him in his examination of one of his witnesses. The record is bare of what the witness would have answered if she had been permitted to answer. Consequently, prejudicial error is not shown. This assignment of error is overruled upon the authority of *S. v. Poolos, supra.*

Defendant has other assignments of error which on their face do not disclose the evidence challenged but compel us to go on a voyage of discovery through the record to discover the challenged testimony. This is a non-compliance with the Rules of this Court. We have repeatedly held that while the form of the assignments of error must depend largely upon the circumstances of each case, they

should clearly present the error relied upon without the necessity of going beyond the assignment itself to learn what the question is. Thus, they must specifically show within themselves the question sought to be presented, and a mere reference in the assignment of error to the record page where the asserted error may be discovered is not sufficient. 1 Strong's N. C. Index 2d, Appeal and Error, § 24 at 148-49.

The charge is not included in the case on appeal. It is, therefore, presumed to be free from error and that the jury was properly instructed as to the law arising upon the evidence as required by G.S. 1-180. *S. v. Harrison,* 239 N.C. 659, 80 S.E. 2d 481; 1 Strong's N. C. Index 2d, Appeal and Error, § 42 at 185.

We have carefully examined all the exceptions and assignments of error in the record before us and gone on a voyage of discovery several times, and, in our opinion, no error has been made to appear that would warrant a new trial. The evidence was conflicting, but that was for the twelve to decide and not this Court.

The verdict and judgment of the court below will be upheld.

No error.