STATE OF NORTH CAROLINA v. JAMES EDWARD (JIMMY) BRITT

No. 36

(Filed 15 May 1974)

1. **Homicide § 4— premeditation defined**

Premeditation ·means thought beforehand for some length of time, however short.

2. **Homicide § 4— deliberation defined**

Deliberation does not require brooding or reflection for any appreciable length of time, but imports the execution of an intent to kill in a cool state of blood without legal provocation and in furtherance of a fixed design.

3. **Homicide § 21— premeditation and deliberation — sufficiency of evidence**

The State's evidence was sufficient to allow a legitimate inference of premeditation and deliberation so as to require the trial judge to submit an issue of first degree murder to the jury where it tended to show that there was ill feeling between defendant and the victim because defendant had been "going with" the victim's estranged wife, that on the evening of the shooting defendant told a deputy sheriff that if he could not take care of the victim, defendant could, that defendant purchased a pistol some three to four days prior to the shooting, that defendant took the pistol and a shotgun to the house of the victim's wife, placed the shotgun on the couch where he was sitting and had the pistol on a nearby table, that the victim had his hands raised and was fleeing from defendant when he was shot in the back, and that defendant did not attempt to aid the victim after the shooting.

4. **Criminal Law § 132— motions to set aside verdict and for new trial**

Motions to set aside the verdict and for a new trial on the ground the verdict was contrary to the greater weight of the evidence were addressed to the sound discretion of the trial judge and are not reviewable on appeal in the absence of abuse of discretion, and no abuse of discretion appears in the denial of such motions in this first degree murder case. G.S. 15-174; G.S. 1A-1, Rule 59.

5. **Criminal Law § 127— motion for arrest of judgment**

No fatal defect appears on the face of the record proper in this first degree murder case which would support defendant's motion for arrest of judgment.

6. **Homicide § 20— admissibility of pistol**

A .357 magnum pistol was sufficiently connected with a homicide to permit its admission in evidence where defendant testified that he shot the victim with a .357 magnum pistol, and a deputy sheriff testified that he had received the pistol from defendant's wife on the night of the shooting, that it had been in his possession since that time and that it was the weapon described by defendant in his testimony as being the one used in the shooting.

7. **Criminal Law § 169— exclusion of evidence — answer not in record**

Where the record fails to show what the witness would have testified had he been permitted to answer questions objected to, the exclusion of such testimony is not shown to be prejudicial.

8. **Homicide § 15— sustaining of objection — failure to move to strike — absence of prejudice**

In this homicide prosecution, defendant was not prejudiced when the court sustained the solicitor's objection to defendant's testimony that he found two bullet holes in the rear screen of the residence in which the shooting occurred, thereby somewhat refuting testimony that the victim was shot as he ran out the front door with his hands raised, where there was no motion to strike the testimony and the trial judge gave no instruction to the jury to disregard the testimony.

9. **Constitutional Law § 29; Jury § 7; Criminal Law § 135— jury selection — right to question as to death penalty views**

In a first degree murder prosecution, the trial court erred in refusing to allow counsel for defendant and the solicitor to inquire into the moral or religious scruples, beliefs and attitudes of the prospective jurors concerning capital punishment.

10. **Criminal Law §§ 120, 135, 138— instructions on punishment — death penalty**

While it is not ordinarily the duty of the trial judge in criminal actions to instruct the jury as to punishment, in a capital case there may be a compelling reason which makes disclosure necessary in order to keep the trial on an even keel and to insure complete fairness to all parties; thus, if the trial judge in a capital case observes that the jury is confused or uncertain as to whether one of its permissible verdicts would result in a mandatory death sentence, the trial judge should act to alleviate such confusion or uncertainty by informing the jury of the consequences of their possible verdicts.

11. **Criminal Law §§ 120, 135, 138— capital case — duty of court to inform jury as to punishment**

When the jury in a first degree murder case returned a verdict of "first degree murder, with mercy," it became apparent that the jurors were confused as to the law and as to their duties as jurors, and the trial judge should have informed them that under the exist-

ing law, neither the jury nor the court had any discretion as to punishment if the jury returned a verdict of guilty of first degree murder.

**12. Criminal Law §§ 102, 135— jury argument on death penalty**

    While counsel in a capital case may not argue the question of punishment in the sense of attacking the validity, constitutionality or propriety of the imposition of the death penalty, counsel may inform or remind the jury that the death penalty must be imposed in the event it should return a verdict of guilty upon a capital charge.

APPEAL by defendant from *Bailey, J.,* 27 August 1973 Session ROBESON Superior Court.

Criminal prosecution upon a bill of indictment charging defendant Jimmy Britt with the first degree murder of Clarence Blackwell. Upon his arraignment, defendant, through counsel, entered a plea of not guilty.

The following is a summary of the evidence introduced at the trial. Carl Herring, a deputy sheriff of Robeson County, testified that on 3 May 1973, at about ten o'clock p.m., Jimmy Britt came to his house and reported that Clarence Blackwell had been harassing Blackwell's estranged wife, Carolyn. Defendant offered to give the officer $50 if he would "lock Blackwell up." Deputy Herring told defendant that under the circumstances related to him, there was nothing he could do. He advised defendant to go home, and told defendant that he would follow Mrs. Blackwell to work that night, and if her husband violated any law, he would place him under arrest. Defendant then told the officer that if he (Herring) couldn't take care of it, he (Britt) could. Britt further stated that "he would take care of him and that he was not going to mess her that night like he did the night before." Later, in response to a radio message, Deputy Herring and Deputy Sanderson proceeded to the residence occupied by Carolyn Blackwell and her children. Upon arriving on these premises at approximately eleven o'clock, they found the body of Clarence Blackwell lying face down in the front yard. At that time, the officers observed a wound in Blackwell's back and two wounds in the front of his body. No weapons were found in Blackwell's automobile or near his body. A pocket knife was found in a chair in the living room of the residence. Officer Herring later saw defendant at the hospital where he was being treated for cuts on his hand, arm, stomach and back.

David Blackwell, decedent's ten year old son, testified that he was awakened by a noise on the night of 3 May 1973, and

---

State v. Britt

---

upon going into the hall, he saw defendant and his father fighting in a chair. He saw his father run out the front door with his hands in the air, and at that time defendant fired a short gun toward the front door. Defendant then picked up a longer gun and left. David said that he found an open pocket knife in the living room which he recognized as his father's knife. He closed the knife and put it under a cushion of the chair in which the two men had been fighting. He did not see his father after he ran out the front door.

Mrs. Neill Watson testified that she lived next door to Mrs. Blackwell on 3 May 1973. On that night at about ten o'clock, she saw defendant's truck and a patrol car stopped down the road. After the patrol car left, she saw defendant's car leave and go toward town. A few minutes later she saw defendant follow Mrs. Blackwell's automobile toward town. They both returned in a short time and entered the Blackwell house. Later she saw Mr. Clarence Blackwell enter the house, and in about three or four minutes Mr. Blackwell ran from the house with his hands upraised. She heard a shot and saw Mr. Blackwell pitch from the porch into the yard. She heard him say, "Oh my God." She observed these latter occurrences from her window next to Mrs. Blackwell's house.

Billy Ray Watson, the fifteen year old son of Mrs. Neill Watson, testified that he saw defendant's truck sitting in the driveway of their yard at about ten o'clock p.m. This driveway led to defendant's house. At that time, a patrolman was sitting about fifty feet down the road. Defendant left immediately after the patrolman. He later saw Mrs. Blackwell and Jimmy Britt enter the Blackwell house at about 10:25 p.m. A short time later he heard a horn blow, and upon going into the front yard, he saw and talked with Mr. Clarence Blackwell. The next time he saw Mr. Blackwell, he was " . . . coming through the front door, he was moving fast. His hands were being held like this. (indicating) They were up in the air, raised. I heard a shot. When I heard it, Mr. Blackwell was right close to the doorsteps. He was on the porch. When I heard the shot, Mr. Blackwell fell forward and I heard him say, 'Oh, my God.' I didn't see him wiggle after he hit the ground. That is basically what happened that night." He was standing at the window by his mother when he saw Mr. Blackwell run from the house.

Dr. Marvin Thompson, a physician specializing in pathology, testified that he performed an autopsy on the body of

Clarence Blackwell. He found an entry wound in his back and two exit wounds in his abdomen. He was unable to say how the single bullet caused the two exit wounds but theorized that the bullet might have split. In his opinion Clarence Blackwell died from a hemorrhage resulting from a gunshot wound.

H. L. Wiggins testified that he sold defendant a .357 magnum pistol three or four days before Clarence Blackwell was shot.

The State rested, and defendant's counsel moved for a dismissal and a directed verdict of not guilty. The Motions were denied.

Defendant, Jimmy Britt, testified that on 3 May 1973, between 9:30 and 10:00 p.m. Clarence Blackwell called him and told him that he was going to kill him and Blackwell's estranged wife, Carolyn. Defendant stated that he went to the police station where he talked to Officer Wesley Baxley. Upon leaving the police station, he talked to an auxiliary policeman named John McLendon. After calling Carolyn Blackwell, he went to see Deputy Sheriff Carl Herring who told him that, "He couldn't go." He then went to Carolyn Blackwell's house and again called the police station. After calling the police station, he returned to the couch where he had been sitting, and at that time Clarence Blackwell burst into the room and began cutting him. Despite his attempts to get away, Blackwell cut him on his back, leg and stomach. While he was being cut, he managed to reach his pistol and shoot Blackwell. He then picked up his shotgun and left, leaving Blackwell crawling out the door. He went to the police station and from there to the hospital. On cross-examination he admitted that he had been "going with" Carolyn Blackwell since March, and that he went to her house on the night of 3 May 1973, armed with a pistol and a shotgun.

Police Officer Burley Hammonds testified that he saw defendant at about ten o'clock p. m. on 3 May 1973. Defendant told him that he was having trouble with Clarence Blackwell and asked him if it was illegal for him to carry a shotgun in his truck. He next saw defendant at about 10:45 p.m. in the police station after defendant had been cut.

John D. McLendon testified that he saw defendant at about 10:00 p.m. on 3 May 1973, and Britt, at that time, told him that a man was threatening to kill him.

State v. Britt

Carolyn Blackwell testified that defendant came to her house on the night of 3 May 1973, armed with a shotgun and a pistol. While she and defendant were sitting in the living room, her husband rushed into the room. Defendant picked up his shotgun, and she went to the back of the house. She went to the Britt home but shortly returned and left the premises with her children. She saw something on the ground in front of her house as she was leaving. On cross-examination, she admitted that she had been going with Jimmy Britt since March.

Mrs. Neill Watson was recalled to the stand, and she testified that she could clearly see Blackwell as he ran out of the house.

Defendant rested, and the State recalled Deputy Sheriff Herring who identified a .357 magnum pistol as the weapon which he had obtained from defendant's home. This pistol was introduced into evidence. On cross-examination, Deputy Sheriff Herring stated:

"I have had an opportunity to examine the Watson home since Court yesterday. It is true that the two windows of that home, on the west side nearest the highway, are boarded up. I went to the open window on the west side of that house and stood in front of it and looked back toward the Blackwell front porch. You can see about half the porch but I could not see the front door. I could see the outer part of the steps but I couldn't see them right up next to the porch. . . . "

Both the State and defendant rested. Judge Bailey denied defendant's Motions for dismissal and a directed verdict of not guilty.

The jury returned a verdict of guilty of murder in the first degree, as charged in the bill of indictment. Defendant appealed from judgment sentencing him to death by asphyxiation.

*Attorney General Robert Morgan by Assistant Attorney General James E. Magner, Jr. and Associate Attorney Archie W. Anders for the State.*

*Johnson, Hedgpeth, Biggs & Campbell by John Wishart Campbell for the defendant appellant.*

BRANCH, Justice.

Defendant first assigns as error the action of the trial judge in denying his Motions for "a Judgment of Dismissal" and a directed verdict of not guilty.

The Motion to Dismiss and the Motion for a Directed Verdict of not guilty presented the question of whether the evidence was sufficient to warrant its submission to the jury and to support a verdict of guilty of the offense charged in the indictment. *State v. Cooper*, 275 N.C. 283, 167 S.E. 2d 266. These Motions have the same legal effect as a Motion for Judgment in case of nonsuit. *State v. Glover*, 270 N.C. 319, 154 S.E. 2d 305.

The lodging of these Motions when the indictment charges first degree murder requires the trial judge to determine whether the evidence, when taken in the light most favorable to the State, is sufficient to raise a legitimate inference, and to permit the jury to find that a defendant, after premeditation and deliberation, formed a fixed purpose to kill and thereafter accomplished his purpose. *State v. Johnson*, 278 N.C. 252, 179 S.E. 2d 429; *State v. Perry*, 276 N.C. 339, 172 S.E. 2d 541.

All of the evidence in this case discloses that defendant did intentionally shoot deceased with a deadly weapon thereby proximately causing his death. Defendant's counsel, therefore, properly restricts his argument to the question of whether the evidence was sufficient to permit a jury to find that defendant acted after premeditation and deliberation.

[1] Premeditation means thought beforehand for some length of time, however short. *State v. Johnson, supra; State v. Reams*, 277 N.C. 391, 178 S.E. 2d 65, cert. den. 404 U.S. 840, 30 L.Ed. 2d 74, 92 S.Ct. 133.

[2] Deliberation does not require brooding or reflection for any appreciable length of time, but imports the execution of an intent to kill in a cool state of blood without legal provocation, and in furtherance of a fixed design. *State v. Johnson, supra; State v. Lamm*, 232 N.C. 402, 61 S.E. 2d 188.

"Cool state of blood" does not mean the absence of passion and emotion, but an unlawful killing is deliberate and premeditated if done pursuant to a fixed design to kill, notwithstanding that defendant was angry or in an emotional state at the time unless such anger or emotion was such as to disturb the faculties and reason. *State v. Reams, supra; State v. Faust,*

---

State v. Britt

---

254 N.C. 101, 118 S.E. 2d 769, cert. den. 368 U.S. 851, 7 L.Ed. 2d 49, 82 S.Ct. 85.

In *State v. Van Landingham,* 283 N.C. 589, 197 S.E. 2d 539, we stated:

> "Ordinarily it is not possible to prove premeditation and deliberation by direct evidence. These facts must be established by proof of circumstances from which they may be inferred. Among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are: want of provocation on the part of the deceased; the conduct of defendant before and after the killing; the use of grossly excessive force, or the dealing of lethal blows after the deceased has been felled."

*See State v. Walters,* 275 N.C. 615, 170 S.E. 2d 484, and *State v. Fountain,* 282 N.C. 58, 191 S.E. 2d 674.

In instant case, there was evidence of ill feeling between defendant and Clarence Blackwell, stemming from defendant's relationship with Blackwell's estranged wife.

On the evening of the shooting, defendant told Deputy Sheriff Herring that he had been to the City Police, talked to them about Clarence Blackwell, and "didn't get no satisfaction." He told the Deputy that if he couldn't take care of Blackwell, he, defendant could. He said that Clarence Blackwell was not going to "mess" Carolyn Blackwell that night like he did the night before. Defendant had purchased the .357 magnum pistol some three or four days prior to the shooting. He took this weapon and a shotgun into Mrs. Blackwell's house, placed the shotgun on the couch where he was sitting and laid the pistol on a nearby table. Defendant testified he shot Clarence Blackwell with the .357 magnum pistol.

Three witnesses testified that Clarence Blackwell had his hands raised and was fleeing from defendant when the shot was fired. Expert medical testimony tended to show that Clarence Blackwell died as a result of a gunshot wound that entered from his back, and that there were no powder burns on deceased's body.

After the shooting, defendant did not attempt to aid the stricken victim, but according to his own testimony, "I cocked the gun and started to shoot him again and thought I better not. He was on the floor at the time and coming after me. I was going

to shoot him." Defendant then walked out of the house carrying the pistol and the shotgun. He testified that he left Blackwell on the floor, "pulling or crawling or something."

**[3]** This evidence, when taken in the light most favorable to the State, is sufficient to allow a legitimate inference of premeditation and deliberation so as to require the trial judge to submit murder in the first degree to the jury.

The trial court properly refused to grant defendant's Motions for Judgment of Dismissal and a directed verdict of not guilty.

Following the jury verdict of guilty of murder in the first degree, defendant moved that the verdict be set aside as being contrary to the weight of the evidence and the law. This motion was denied. Defendant then moved for a new trial. This motion was also denied.

**[4, 5]** We find no merit in defendant's contention that the trial judge erred in denying these motions to set aside the verdict and for a new trial on the ground that the verdict was contrary to the greater weight of the evidence. The motions were addressed to the sound discretion of the trial judge, and in the absence of abuse of discretion are not reviewable on appeal. G.S. 15-174; G.S. 1A-1, Rule 59; *State v. Bridgers,* 267 N.C. 121, 147 S.E. 2d 555; *Pruitt v. Ray,* 230 N.C. 322, 52 S.E. 2d 876; *State v. Wagstaff,* 219 N.C. 15, 12 S.E. 2d 657; 6A Moore's Federal Practice, § 59.05 (5). No abuse of discretion is shown. Neither do we find any fatal defect on the face of the record proper which would support defendant's motion for arrest of judgment. *State v. Chestnutt,* 241 N.C. 401, 85 S.E. 2d 297; *State v. Higgins,* 266 N.C. 589, 146 S.E. 2d 681.

**[6]** Defendant next assigns as error the ruling of the trial judge permitting the introduction into evidence of a .357 magnum pistol. He argues that this weapon was not sufficiently connected with the commission of the offense to permit the trial court to admit it into evidence.

Defendant testified that he shot Clarence Blackwell with a .357 magnum pistol. Later on direct examination by defendant's counsel, Deputy Sheriff Herring testified that Britt's wife brought the weapon and a shotgun to him after the shooting.

Thereafter Deputy Herring was called as a rebuttal witness and testified that he received State's Exhibit 4, a .357 magnum

pistol, from defendant's wife on the night of the shooting, that it had been in his possession since that time, and that it was the weapon described by defendant in his testimony as being the one used in the shooting of Clarence Blackwell.

Any object which has a relevant connection with the case is admissible in evidence. *State v. Sneeden,* 274 N.C. 498, 164 S.E. 2d 190; *State v. Hamilton,* 264 N.C. 277, 141 S.E. 2d 506. Thus, weapons may be admitted into evidence when there is evidence tending to show that they were used in the commission of a crime. *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38; *State v. Patterson,* 284 N.C. 190, 200 S.E. 2d 16; *State v. Wilson,* 280 N.C. 674, 187 S.E. 2d 22; *State v. Sneeden, supra;* 1 Stansbury's North Carolina Evidence § 118 (Brandis Revision, 1973).

Here the evidence was sufficient to identify State's Exhibit 4 as the pistol used in the commission of the crime charged. Even absent such identification, admission of the exhibit would have been harmless error in view of defendant's testimony admitting that he shot Clarence Blackwell with a .357 magnum pistol. *State v. Wilson, supra.*

[7] Defendant contends that the trial judge erred in two instances by refusing to admit testimony concerning conversations he had with police officers. The record does not disclose what the witness would have said had he been permitted to testify.

> "Where the record fails to show what the witness would have testified had he been permitted to answer questions objected to, the exclusion of such testimony is not shown to be prejudicial. This rule applies as well to questions asked on cross-examination."

*State v. Kirby,* 276 N.C. 123, 171 S.E. 2d 416. *Accord, State v. Staten,* 271 N.C. 600, 157 S.E. 2d 225. *See* 3 N. C. Index 2d, Criminal Law § 169 and cases there cited.

There is no merit in this contention.

[8] Defendant argues that the trial judge erred in refusing to permit him to testify as to the condition of the rear door of the residence in which the shooting took place.

On redirect examination of defendant, the following occurred:

> "After I got out of the hospital, I made an examination of the back screen. I could see where the bullet went, and

I found the holes in the back screen door, two holes about so far apart through the screen. (indicating)

Q. State whether or not they were there before the shooting if you know.

A. No, sir, they were not.

MR. BRITT: Object.

THE COURT: Sustained."

It should be noted that there was no motion to strike this testimony and that the trial judge gave no instruction to the jury to disregard the testimony. Defendant seems to have successfully placed before the jury testimony which tended to show that the bullet exited from Blackwell's body and went through the back screen, and thereby in some degree refuted the testimony that Blackwell was shot as he ran out the front door with his hands upraised. We see no prejudice to defendant in this ruling.

Defendant contends that the trial judge committed prejudicial error during the voir dire examination of prospective jurors by, in effect, ruling that defendant's counsel could not examine prospective jurors concerning their moral or religious scruples, beliefs and attitudes toward capital punishment.

During the voir dire examination of prospective jurors by Mr. Britt for the State, the following colloquy occurred:

"JUROR: Mr. Solicitor, I wanted to inquire whether if we find this man guilty the death penalty would be involved, as I am against capital punishment and would not vote to convict a person knowing that he would be sentenced to death.

MR. BRITT: The Court will have to answer your question.

THE COURT: Mr. Juror, the question of punishment should be of no concern to you; the jury has nothing to do, whatsoever, with punishment in this or any other criminal case. *The punishment of a person convicted is entirely in the hands of the Court and is no concern of yours.* Does that answer your question?

JUROR: Well, sir, I just wanted the Solicitor to know that I was opposed to capital punishment." (Emphasis ours.)

It was stipulated by counsel for defendant and by the State that in the trial of this cause Judge Bailey ruled that no mention was to be made in the presence of the jury of the fact that this was a capital case or that the death penalty might be imposed.

It is well established by our decisions and the decisions of the federal courts that in a capital case both the State and the defendant may, on the voir dire examination of prospective jurors, make inquiry concerning a prospective juror's moral or religious scruples, his beliefs and attitudes toward capital punishment, to the end that both the defendant and the State may be insured a fair trial before an unbiased jury. *Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770; *Swain v. Alabama,* 380 U.S. 202, 13 L.Ed. 2d 759, 85 S.Ct. 824; *Logan v. United States,* 144 U.S. 263, 36 L.Ed. 429, 12 S.Ct. 617; *Turberville v. United States,* 303 F. 2d 411, cert. den. 370 U.S. 946, 8 L.Ed. 2d 813, 82 S.Ct. 1607; *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38; *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750; *State v. Honeycutt,* 285 N.C. 174, _____ S.E. 2d _____ . A prospective juror's response to such inquiry by counsel may disclose basis for a challenge for cause or the exercise of a peremptory challenge. The extent of the inquiries, of course, remains under the control and supervision of the trial judge.

[9] It was error for the trial judge to refuse to allow counsel for defendant and the Solicitor for the State to inquire into the moral or religious scruples, beliefs and attitudes of the prospective jurors concerning capital punishment.

It is apparent that the decision of the United States Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726, and our interpretations of the effects of the *Furman* decision as related to punishment in capital cases have created some uncertainty among lawyers, the judiciary, and the general public, the source of the triers of fact in most litigation. It is probable that the enactment by the 1974 General Assembly of Senate Bill 157, "An Act to Amend G.S. 14-17 Murder Defined and Punishment Provided for Murder, Rape, Burglary and Arson," Chapter 1201, Session Laws 1973-74 (effective 8 April 1974), will for a time accentuate this uncertainty. We,

therefore, deem it proper to clarify the law concerning the duty of the trial judge to instruct the jury as to punishment in capital cases, and to further clarify the law as to the right of counsel to argue the question of the death penalty to a jury.

Initially we consider the question of whether the trial judge in a capital case has the duty to instruct the jury on the question of punishment.

During the jury deliberations, the following occurred in open court:

"THE CLERK: Mr. Foreman, has the Jury agreed upon the verdict?

THE FOREMAN: We have, sir.

THE CLERK: Would the defendant please stand?

(Defendant complies)

THE FOREMAN: First—

THE CLERK: Just a minute, please, sir.

Ladies and Gentlemen of the Jury, how do you find the defendant, James Edward Britt, guilty of murder in the first degree as charged in the Bill of Indictment, or guilty of murder in the second degree, or guilty of voluntary manslaughter, or guilty of involuntary manslaughter or not guilty?

THE FOREMAN: First-degree murder, with mercy.

THE COURT: That is not a possible verdict. The verdict must be either guilty of murder in the first degree *or guilty of whatever you find him guilty of*. The Court will not accept the recommendation of the Jury as to punishment in the matter, *for punishment is entirely for the Court.*" (Emphasis ours.)

The question of whether the trial judge should inform the jury as to the punishment which a verdict would allow or require him to impose was considered by this Court in *State v. Rhodes*, 275 N.C. 584, 169 S.E. 2d 846. In that case, defendant was convicted of rape and the jury recommended life imprisonment. The Court imposed the mandatory life sentence *as then required by G.S. 14-21*. Defendant appealed, contending among

other things that the trial judge committed prejudicial error when in response from an inquiry from the jury, he told the jurors the punishment which could be imposed upon conviction of the lesser offense of assault with intent to commit rape. Holding the Court's action to be nonprejudicial error, this Court, speaking through Justice Sharp, stated:

> "In this jurisdiction, except in one class of cases, the presiding judge fixes the punishment for a convicted defendant within the limits provided by the applicable statute. The exception is capital cases in which the jury may reduce the penalty from death to life imprisonment. G.S. 14-17 (murder in the first degree); G.S. 14-21 (rape); G.S. 14-52 (burglary in the first degree); G.S. 14-58 (arson). In all other instances, the jury has performed its function and discharged its duty when it returns its verdict of guilty or not guilty. *State v. Davis,* 238 N.C. 252, 77 S.E. 2d 630; *State v. Howard,* 222 N.C. 291, 22 S.E. 2d 917; *State v. Matthews,* 191 N.C. 378, 131 S.E. 743.

> " . . . *In the absence of some compelling reason which makes disclosure as to punishment necessary in order 'to keep the trial on an even keel'* and to insure complete fairness to all parties, the trial judge should not inform the jurors as to punishment *in noncapital cases.* If information is requested he should refuse it and explain to them that punishment is totally irrelevant to the issue of guilt or innocence. When, however, such information is inadvertently given, the error will be evaluated like any other." (Emphasis ours.)

At the time *Rhodes* was decided, the trial judge in capital cases was *required* to charge on punishment because of the proviso in G.S. 14-21 which permitted the jury to recommend upon return of their verdict that the punishment should be life imprisonment, thereby fixing the punishment to be imprisonment for life. This accounts for the language in *Rhodes* which states that the trial judge should not inform the jurors as to punishment in "noncapital cases." The reason for this exception in capital cases was removed when the decision in *Furman v. Georgia, supra,* abrogated the right of the jury to recommend life imprisonment. Since the decision in *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19, a conviction in a capital case which occurred after 18 January 1973, requires the mandatory imposition of the death penalty.

Even after the decision in *Furman* and *Waddell*, we have adhered to the general rule stated in *Rhodes* that absent compelling reasons for disclosure the trial judge should not inform a jury as to punishment. *See State v. Henderson*, 285 N.C. 1, 203 S.E. 2d 10; *State v. Watkins*, 283 N.C. 504, 196 S.E. 2d 750; *State v. Washington*, 283 N.C. 175, 195 S.E. 2d 534; *State v. Waddell, supra.*

In *State v. Waddell, supra,* we said:

"The punishment to be imposed for these capital felonies is no longer a discretionary question for the jury and therefore no longer a proper subject for an instruction by the judge."

In *State v. Watkins, supra,* the jury convicted the defendant of murder in the first degree and recommended mercy. Defendant appealed from a sentence of death by asphyxiation. One of defendant's assignments of error was that the trial judge failed to inform the jury that a conviction of murder in the first degree would result in a mandatory sentence of death. The assignment of error was overruled on the ground that no prejudice resulted to the defendant since the death sentence was being vacated by this Court pursuant to the holding in *Waddell* that the death sentence could not be imposed as a result of a capital crime committed prior to 18 January 1973. The murder for which defendant Watkins was convicted occurred on 24 February 1972. The opinion in *Watkins* contained a dictum statement approving the general rule set out in *Rhodes.*

In the case of *State v. Washington, supra,* this Court again approved the general rule that the trial judge is not required to instruct as to punishment. There Judge Brewer with reference to a charge of rape instructed the jury that, "if you return a verdict of guilty of rape, the law provides that the defendant will be put to death in the gas chamber." The rape was committed on 2 August 1972. This Court found the error to be nonprejudicial on the issue of guilt or innocence, and speaking through Chief Justice Bobbitt, in part, stated:

"In the light of *Waddell*, Judge Brewer should have submitted this case for jury determination solely in respect of whether defendant was guilty or not guilty of rape without referring to the punishment in the event of conviction; and, if convicted, defendant should have been sentenced to imprisonment for life. This is the appropriate procedure

State v. Britt

in respect of trials for the crimes of murder in the first degree, rape, burglary in the first degree and arson committed *prior to* 18 January 1973. . . . "

The record in *Washington* does not disclose whether counsel were allowed to inquire of prospective jurors as to their religious or moral convictions and their attitudes toward the death penalty.

We again considered this question in the case of *State v. Henderson, supra.* There defendant was charged with rape and first degree burglary. During the jury deliberations the jury returned to the courtroom and the following exchange took place between the trial judge and the foreman of the jury:

"THE COURT: I understand the jury has a question?

FOREMAN: Yes, sir, we would like further instructions regarding the punishment and whether or not we can make a recommendation.

THE COURT: First of all, I will instruct you the penalty to be imposed is really not your concern. Your function is to pass on the guilt or not guilt as to both counts. So, I will not instruct you on what the penalty will be, that is not a concern of yours. As far as the recommendation is concerned, you cannot make a recommendation. You find him guilty or not guilty according to the evidence and the instructions I have given you."

In *Henderson,* we held that the trial judge properly refused to instruct the jury as to the punishment which would result from a conviction of rape or first degree burglary. Again, the record in *Henderson* does not disclose whether the trial judge precluded counsel from examining prospective jurors concerning their beliefs and attitudes toward capital punishment. It should be noted that the trial judge elected to answer the main inquiry from the jury by explaining to them that they could not make any recommendation. We did not discuss the question of whether such compelling reasons existed as to require disclosure of punishment.

The purpose of an instruction is to clarify the issues for the jury and to apply the law to the facts of the case. *State v. Jennings,* 276 N.C. 157, 171 S.E. 2d 447; *Stern Fish Co. v. Snowden,* 233 N.C. 269, 63 S.E. 2d 557; 7 N. C. Index 2d, Trial § 32. We must always remain advertent to the fact that the para-

mount duty of the trial judge is to control the course of a trial so as to prevent injustice to any party. In the exercise of this duty he possesses broad discretionary powers. *Greer v. Whittington,* 251 N.C. 630, 111 S.E. 2d 912; *Miller v. Greenwood,* 218 N.C. 146, 10 S.E. 2d 708.

It must be borne in mind that at the present time, neither the trial judge nor the jury has discretion in imposing punishment when a person is convicted of a capital crime, *State v. Waddell, supra,* and that in capital cases all prospective jurors may be examined concerning their attitudes toward capital punishment. *State v. Crowder, supra.*

[10] We cannot perceive how the question of instruction concerning the penalty in a capital case can often arise in light of the above-stated principles of law. Nevertheless, we here reaffirm and adhere to the proposition that ordinarily it is not the duty of the trial judge in criminal actions to instruct the jury as to punishment. However, we recognize that in a capital case, there may be a "compelling reason which makes disclosure as to punishment necessary in order 'to keep the trial on an even keel' and to insure complete fairness to all parties. . . . " *State v. Rhodes, supra.* Thus in a capital case if the jury appears to be confused or uncertain, the trial judge should act to alleviate such uncertainty or confusion. Specifically, if the trial judge observes that the jury is confused or uncertain as to whether one of its permissive verdicts would result in a mandatory death sentence, in our opinion, sufficient compelling reason exists to justify his informing the jury of the consequence of their possible verdicts.

[11] In instant case, when the jury returned a verdict of "first degree murder, with mercy," it became apparent that the jurors were confused as to the law and as to their duties as jurors. At that point the trial judge should have informed them that under the existing law, neither the jury nor the Court had any discretion as to punishment if the jury returned a verdict of guilty of first degree murder. The need for such action on the part of the trial judge is underscored by the fact that on two occasions the trial judge used language in the presence of the jury which might well have left the jury with the erroneous impression that he had some discretion in imposing punishment in the event the jury returned a verdict of guilty of murder in the first degree. Further the gravity of this case, and the apparent confusion and uncertainty among the jurors when the un-

accepted verdict was returned, demanded more clarification as to possible verdicts than the statement: "The verdict must be either guilty of murder in the first degree or guilty of whatever you find him guilty of."

[12]  Finally, we consider whether counsel may argue to the jury the question of the death penalty in a capital case.

In *State v. Dillard*, 285 N.C. 72, 203 S.E. 2d 6, the defendant was convicted of first degree murder. On appeal, defendant assigned as error the ruling that defendant's counsel could not make an argument to the jury upon the question of punishment. The Court, speaking through Justice Lake, held that there was no error in the Court's ruling that defendant's counsel could not make an *argument* to the jury upon the *question* of the punishment to be imposed.

In his brief in this Court, counsel for Dillard properly, though in our opinion erroneously, argued at length that the imposition of the death penalty upon a defendant lawfully convicted of murder in the first degree was a violation of such defendant's constitutional rights, contending that the death penalty is cruel and unusual punishment as a matter of law. Such an argument to a jury would be improper for the reason that the law of this State is otherwise. Counsel may, in his argument to the jury, in any case, read or state to the jury a statute or other rule of law relevant to such case, including the statutory provision fixing the punishment for the offense charged. G.S. 84-14; *State v. Crisp*, 244 N.C. 407, 94 S.E. 2d 402, 67 A.L.R. 2d 236; Annot. 67 A.L.R. 2d 245. He may not, however, state the law incorrectly or read to the jury a statutory provision which has been declared unconstitutional. *See, State v. Banner*, 149 N.C. 519, 526, 63 S.E. 84. Nor may counsel argue to the jury that the law ought to be otherwise, that the punishment provided thereby is too severe and, therefore, the jury should find the defendant not guilty of the offense charged but should find him guilty of a lesser offense or acquit him entirely.

*State v. Dillard, supra,* did not hold that counsel, in his argument to the jury, cannot inform or remind the jury that the death penalty must be imposed in the event it should return a verdict of guilty upon a capital charge. Rather *Dillard* stands for the proposition that counsel may not argue the question of punishment in the sense of attacking the validity, constitutionality, or propriety of the imposition of the death penalty.

We do not deem it necessary to consider the remaining assignments of error since they may not arise at the next trial.

For reasons stated, there must be a

New trial.